SIDLEY AUSTIN LLP
Eric Schwartz (SBN 266554)
eschwartz@sidley.com
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Tel: (213) 896-6000
Fax (213) 896-6600

SIDLEY AUSTIN LLP
Charles K. Schafer, Esq.
cschafer@sidley.com
James W. Ducayet, Esq.
jducayet@sidley.com
Natalie C. Chan, Esq.
natalie.chan@sidley.com
Benjamin I. Friedman, Esq.
benjamin.friedman@sidley.com
One South Dearborn Street
Chicago, Illinois 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

*Attorneys for Defendant Guzman Y Gomez Corp.*

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CREED UNCO, LLC, a Texas limited liability company; GREG CREED, an individual; TIM CREED, an individual; ROBERT A. FULMER, an individual; EDWIN DE FERRANTE, an individual; CHRIS ARMBRUSTER; an individual; JENNIFER HENRY, an individual<br><br>Plaintiffs,<br><br>v.<br><br>GUZMAN Y GOMEZ (HOLDINGS) LIMITED, an Australian Company; GUZMAN Y GOMEZ CORP., a Delaware corporation; STEVEN MARKS, an individual; THOMAS DONALD MCKENZIE COWAN, an individual; GAETANO ALFRED RUSSO, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | No. <br><br>**DEFENDANT GYG US'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441**<br><br>State Action Filed: June 29, 2023<br>State Action Served: August 7, 2023 |

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1332, 1441, 1446, Defendant Guzman y Gomez Corp. ("GYG US"), by its undersigned counsel, hereby removes to this Court the above-captioned case, pending as Case No. 30-2023-01333752-CU-FR-NJC in the Superior Court of California for the County of Orange (the "Action"). As grounds for removal, GYG states as follows:

### PRELIMINARY STATEMENT

1.      On June 29, 2023, Plaintiffs Creed Unco, LLC, Greg Creed, Tim Creed, Robert A. Fulmer, Edward De Ferrante, Chris Armbruster, and Jennifer Henry (collectively, "Plaintiffs") filed the attached Complaint in the Superior Court of California for the County of Orange. The Complaint is replete with irrelevant, deliberately misleading, and demonstrably false allegations. But, at its core, the claims asserted in the Complaint arise from: (i) non-party Fuller 74, LLC's purchase of shares of stock in Guzman y Gomez (Holdings) Limited ("GYG Australia"); (ii) GYG US's supposed decision not to hire Greg Creed as an employee; and (iii) GYG US's employment of Plaintiffs Tim Creed, Fulmer, De Ferrante, Armbruster, and Henry (including issues relating to their incentive compensation, Armbruster's resignation, and the termination of Fulmer, De Ferrante, and Armbruster for poor performance). Compl. ¶¶ 50, 56–60, 67, 99, 101–102.

2.      The Complaint purports to assert sixteen different causes of action and twenty-two separate counts under California state law and federal law, including claims for: (i) fraud; (ii) breach of contract; (iii) breach of fiduciary duty; (iv) intentional interference with prospective economic relations; (v) securities fraud, including violations of Rule 10b-5 under Section 10(b) of the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5; (vi) declaratory relief; (vii) wrongful and retaliatory termination; (viii) constructive termination; (ix) age discrimination; (x) intentional infliction of emotional distress; (xi) unfair business practices; and (xii) misappropriation of name and likeness.

3.      GYG US generally denies Plaintiffs' allegations, disputes Plaintiffs' claims, and disputes that Plaintiffs are entitled to any relief. GYG US discusses Plaintiffs' allegations and

claims here solely to demonstrate the propriety of removal. By filing this Notice of Removal, GYG US does not admit any of Plaintiff's allegations, and does not waive any defenses available to it.

**REMOVAL STANDARD**

4.    Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants" to federal district court. Accordingly, an action may be removed if, among other things, it "aris[es] under the Constitution, laws, or treaties of the United States" or "is between "citizens of a State and citizens or subjects of a foreign state." *See* 28 U.S.C. §§ 1331, 1332(a)(2).

**JURISDICTION UNDER THE EXCHANGE ACT OF 1934**

5.    The Complaint's Sixth Cause of Action purports to assert claims of securities fraud under Rule 10b-5 under Section 10(b) of the Exchange Act of 1934, 17 C.F.R. § 240.10b-5. Compl. ¶¶ 195–215. Under 15 U.S.C. § 78aa, federal district courts "have exclusive jurisdiction of violations of [the Exchange Act of 1934] or the rules and regulations thereunder." This provision "gives exclusive jurisdiction to the federal courts to consider Rule 10b-5 claims," *Clark v. Watchie*, 513 F.2d 994, 997 (9th Cir. 1975), and thus such claims are properly removed under 28 U.S.C. § 1441. *Wu v. Sunrider Corp.*, No. CV 17-4825 DSF (SSx), 2017 WL 3475665, at *1 (C.D. Cla. Aug. 11, 2017); *Sharp v. Arena Pharmaceutical, Inc.*, No. 10cv2111 BTM (BLM), 2010 WL 5464918, at *1 (S.D. Cal. Dec. 29, 2010) (holding that removal of 10b-5 claim was proper); *Ackerman v. Nat'l Property Analysts, Inc.*, No. 92 Civ. 0022 (LJF),1992 WL 84477, at *2 (S.D.N.Y. Apr. 10, 1992) (same). The Court therefore has subject matter jurisdiction over this case.

**JURISDICTION UNDER THE ADEA**

6.    The ninth and fifteenth causes of action allege that Defendants violated the Age Discrimination in Employment Act ("ADEA"). Specifically, the Complaint alleges that "[n]otwithstanding the duties imposed on it by FEHA and The Age Discrimination in Employment Act (ADEA), Defendant GYG US discriminated against Plaintiffs based upon their ages, as described above, ultimately resulting in the termination of their employments," and that "Defendant's conduct above described is in violation of various statutes and the decisional law of

1  this state and country, including but not limited to The Age Discrimination in Employment Act
2  (ADEA)." *See* Compl. ¶¶ 230, 277.

3       7.      Claims premised on a violation of federal law are within this Court's original
4  jurisdiction, even where, as here, Plaintiffs also refer to state anti-discrimination laws. *See*, *e.g.*,
5  *Nenninger v. Zanesfield Rod & Gun Club*, Case No. 2:13-cv-1004, 3-4 (S.D. Ohio Nov. 27, 2013)
6  (denying motion to remand because the complaint purported to allege a federal cause of action for
7  violation of the ADEA). Plaintiffs' ADEA claim therefore provides a separate, independent basis
8  for removal.

9                              **DIVERSITY JURISDICTION**

10      8.      This case is also removable because it involves "citizens of a State and citizens or
11  subjects of a foreign state." *See* 28 U.S.C. § 1332(a)(2). As alleged in the Complaint, Plaintiffs are
12  citizens of Texas, Tennessee, Ohio, and California. Compl. ¶ 1–7. The Complaint does not allege
13  the citizenship of Defendants Marks, Russo, or Cowan, *id.* ¶¶ 10–12, but they are all citizens of
14  Australia. The Complaint alleges that GYG US is a citizen of both Delaware (its state of
15  incorporation) and California (because, it contends, its principal place of business is in California).
16  *Id.* ¶ 9. The Complaint is only half right.

17      9.      GYG US is a citizen of Delaware (where it is incorporated), but its principal place
18  of business is in Illinois. GYG US's only corporate office is located in Schaumberg, Illinois; and
19  its lawyers, accountants, and banks are all located in Illinois. All but one of GYG US's 126
20  employees (*i.e.*, 125 out of 126) reside in Illinois. The employees who reside in Illinois include
21  GYG US's chief executive officer, director of operations, head of U.S. culinary operations,
22  director of U.S. marketing, head of U.S. development, and human resources coordinator. GYG US
23  is registered to do business only in Illinois, and files state tax returns only in Illinois and no other
24  jurisdiction. All three of GYG US's restaurant locations are in Illinois, and all of the restaurants
25  currently in development are scheduled to open in Illinois. Every in-person meeting Plaintiffs had
26  with any defendant that occurred in the United States, took place in Illinois. When GYG US's
27  board of directors meets in person, such meetings are held in Illinois. And, as the Complaint
28  concedes, GYG US ultimately terminated Plaintiffs, in part, because they refused to relocate to

1    Illinois—where all of GYG US's operations are located. Compl. ¶ 101 (alleging that Marks told

2    Tim Creed that "he would be required to move to the Chicago-area if he wanted to continue

3    working for Defendant GYG US").

4    10.    Because the Defendants are citizens of Illinois, Delaware, and Australia and

5    Plaintiffs are citizens of Texas, Tennessee, Ohio, and California, there is complete diversity of

6    citizenship. *Carden v. Arkoma Ass.*, 494 U.S. 185, 187. The Court therefore has subject matter

7    jurisdiction under 28 U.S.C. § 1332(a)(2) and removal is proper.

8    **<u>REMOVAL IS OTHERWISE PROCEDURALLY PROPER</u>**

9    11.    *Timeliness*. Plaintiff served GYG US on August 7, 2023. Defendant GYG US

10    hereby files this Notice of Removal on September 5, 2023, which is fewer than 30 days after it

11    was served with the Complaint. *See* 28 U.S.C. § 1446(b)(1).

12    12.    *Co-Defendants' Consent*. Plaintiffs have not properly served any defendant other

13    than GYG US, and therefore the consent of co-defendants is not required. *See* 28 U.S.C.

14    § 1446(b)(2)(A); *Baiul v. NBC Sports, a division of NBC Universal Media, LLC*, 732 Fed. App'x

15    529 ("Our circuit rule is that a party not served need not be joined; the defendants summonsed can

16    remove by themselves"); *Destfino v. Reiswig*, 603 F.3d. 952, 957 (9th Cir. 2011) (holding that

17    defendant was not required to consent to removal because he was not properly served).

18    13.    *Pleadings and Process*. Attached to this Notice of Removal is "a copy of all

19    process, pleadings, and orders served upon" GYG US. 28 U.S.C. § 1446(a).

20    14.    *Filing, Service, and Venue*. A copy of this Notice of Removal is being filed with

21    the Clerk of the Superior Court of California for the County of Orange, and GYG US is giving

22    written notice of this Notice of Removal to all adverse parties. *See* 28 U.S.C. § 1446(d). The

23    Superior Court of California for the County of Orange is located within this district, and thus venue

24    is proper under 28 U.S.C. § 1441. No previous application has been made for the removal of this

25    action.

26    15.    WHEREFORE, GYG US respectfully removes this action, now pending in the

27    Superior Court of California for the County of Orange, to the United States District Court for the

28

DEFENDANT GUZMAN Y GOMEZ CORP.'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441

Central District of California, and respectfully requests this Court assume full jurisdiction over this action.

Dated: September 5, 2023.               SIDLEY AUSTIN LLP

                                        By: */s/ Eric B. Schwartz*

                                        Attorneys for Defendant
                                        Guzman Y Gomez Corp.

# ATTACHMENTS

Electronically Filed by Superior Court of California, County of Orange, 06/30/2023 04:44:00 PM.
30-2023-01333752-CU-FR-NJC - ROA # 7 - DAVID H. YAMASAKI, Clerk of the Court By A. Gill, Deputy Clerk.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
GUZMAN Y GOMEZ (HOLDINGS) LIMITED, an Australian Company; Additional Parties
Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CREED UNCO, LLC, a Texas limited liability company; Additional Parties Attachment form is
attached.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: Judge Glenn Salter<br>*(El nombre y dirección de la corte es):* North Justice Center<br>1275 N. Berkeley Ave., Fullerton CA 92838 | CASE NUMBER:<br>*(Número del Caso):*  30-2023-01333752-CU-FR-NJC |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James Bohm - 600 Anton Blvd., Suite 640,   Shawn Larsen, 15615 Alton Pkwy, Ste. 450, Irvine, CA
Costa Mesa, CA 92626 T: 714-384-6500;   92618 T: 949-769-6601

DATE:   06/30/2023     DAVID H. YAMASAKI, Clerk of the Court   Clerk, by _____ A. Gill _____ , Deputy
*(Fecha)*     *(Secretario)*     *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*  GUZMAN Y GOMEZ CORP., a Delaware corporation;
   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Creed Unco, LLC, et al. v. Guzman Y Gomez (Holdings) Limited, et al. | 30-2023-01333752-CU-FR-NJC |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

[ x ] Plaintiff      [ ] Defendant      [ ] Cross-Complainant      [ ] Cross-Defendant

GREG CREED, an individual; TIM CREED, an individual; ROBERT A. FULMER, an individual; EDWIN DE FERRANTE, an individual; CHRIS ARMBRUSTER; an individual; JENNIFER HENRY, an individual.

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Creed Unco, LLC, et al. v. Guzman Y Gomez (Holdings) Limited, et al. | 30-2023-01333752-CU-FR-NJC |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff      ☒ Defendant      ☐ Cross-Complainant      ☐ Cross-Defendant

GUZMAN Y GOMEZ CORP., a Delaware corporation; STEVEN MARKS, an individual; THOMAS DONALD MCKENZIE COWAN, an individual; GAETANO ALFRED RUSSO, an individual; and DOES 1-50, inclusive.

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Electronically Filed by Superior Court of California, County of Orange, 06/29/2023 10:09:29 AM.
30-2023-01333752-CU-FR-NJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By K. Climer, Deputy Clerk.

1

2

3

4

5

6

7

8

9

10

11

12

**BOHM WILDISH & MATSEN, LLP**
**James G. Bohm, Esq. (SBN 132430)**
jbohm@bohmwildish.com
**Nicholas P. Carrigan, Esq. (SBN 249584)**
ncarrigan@bohmwildish.com
efile@bohmwildish.com
600 Anton Blvd, Suite 640
Costa Mesa, California 92626
Tel: (714) 384-6500
Fax: (714) 384-6501

**LARSEN & NADDOUR, LLP**
**Shawn M. Larsen, Esq. (SBN 204439)**
slarsen@larsennaddour.com
15615 Alton Pkwy., Suite 450
Irvine, CA 92618
Tel: (949) 769-6601

Attorneys for Plaintiffs

13

14

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREED UNCO, LLC, a Texas limited liability company; GREG CREED, an individual; TIM CREED, an individual; ROBERT A. FULMER, an individual; EDWIN DE FERRANTE, an individual; CHRIS ARMBRUSTER; an individual; JENNIFER HENRY, an individual

Plaintiffs

v.

GUZMAN Y GOMEZ (HOLDINGS) LIMITED, an Australian Company; GUZMAN Y GOMEZ CORP., a Delaware corporation; STEVEN MARKS, an individual; THOMAS DONALD MCKENZIE COWAN, an individual; GAETANO ALFRED RUSSO, an individual; and DOES 1-50, inclusive,

Defendants.

Case No.   30-2023-01333752-CU-FR-NJC

Assigned to: Hon.   **Assigned for All Purposes**
Judge Glenn Salter

**PLAINTIFFS' COMPLAINT FOR:**

1.) **FRAUD – INTENTIONAL MISREPRESENTATION**
2.) **FRAUD – NEGLIGENT MISREPRESENTATION**
3.) **BREACH OF CONTRACT**
4.) **BREACH OF FIDUCIARY DUTY**
5.) **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**
6.) **SECURITIES FRAUD:**
   **COUNT ONE**
   **COUNT TWO**
   **COUNT THREE**
7.) **DECLATORY RELIEF**
8.) **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
9.) **AGE DISCRIMINATION**
10.)**FAILURE TO REMEDY AND/OR TO PREVENT DISCRIMINATION**

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**11.) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**12.) UNFAIR BUSINESS PRACTICES UNDER CAL. B&P CODE §17200 ET SEQ.**
**13.) WRONGFUL TERMINATION IN VIOLATION OF FEHA, GOVERNMENT CODE SECTION 12940 ET SEQ.;**
**14.) RETALIATORY TERMINATION IN VIOLATION OF FEHA, GOVERNMENT CODE SECTION 12940 ET SEQ.;**
**15.)    CONSTRUCTIVE DISCHARGE;**
**16.)    MISAPPROPRIATION OF NAME AND LIKENESS**

/ / /

BOHM WILDISH & MATSEN, LLP
600 Anton Blvd
Suite 640
Costa Mesa, CA 92626
(714) 384-6500
(714) 384-6501 (fax)

COMPLAINT

1         COMES NOW PLAINTIFFS CREED UNCO, LLC, a Texas limited liability company; GREG

2   CREED, an individual; TIM CREED, an individual; ROBERT A. FULMER, an individual; EDWIN DE

3   FERRANTE, an individual; CHRIS ARMBRUSTER; an individual; JENNIFER HENRY, an individual

4   (collectively, "PLAINTIFFS"), who complain and allege as follows against GUZMAN Y GOMEZ

5   (HOLDINGS) LIMITED, an Australian Company; GUZMAN Y GOMEZ CORP., a Delaware

6   corporation; STEVEN MARKS, an individual; and DOES 1-50, inclusive (collectively,

7   "DEFENDANTS").

8         As further alleged herein, Plaintiffs are informed and believe, and thereupon allege that Defendants

9   engaged in a multi-faceted scheme to, among other things, deceive Plaintiffs into investing money and

10  sweat equity in three different tranches of unregistered and fraudulent offerings of securities;

11  misappropriate the name and likeness of well-known CEO Greg Creed and leverage Plaintiffs' knowledge

12  and reputation to further Defendants' own business interests without renumeration to Plaintiffs; and

13  interfere with Plaintiffs' lucrative prospective economic relations by insisting that plaintiffs go "all-in" on

14  their investments and commitments to Defendants, to the exclusion of all others. Defendants also breached

15  contracts, clung to a racist logo against Plaintiffs' advice, and discriminated against Plaintiffs based upon

16  age in their employment with Defendants.

17                                    **THE PARTIES**

18       1.    Plaintiff CREED UNCO, LLC ("CREED UNCO") is a limited liability company formed

19  under the laws of the state of Texas in 2020. CREED UNCO is a citizen of the States of Texas, Tennessee,

20  Ohio and California where its members are citizens.

21       2.    Plaintiff Greg Creed ("GREG CREED") is an individual, and a resident and citizen of the

22  State of Texas. At all times relevant hereto, Mr. Greg Creed was over the age of 40.

23       3.    Plaintiff Timothy J. Creed ("TIM CREED") is an individual, and a resident and citizen of

24  the State of Tennessee. Mr. Tim Creed is the son of GREG CREED.

25       4.    Plaintiff Robert (Bob) A. Fulmer ("FULMER") is an individual, and a resident and citizen

26  of the State of California. At all times relevant hereto, Mr. Fulmer was over the age of 40 and was

27  employed by GYG US within the State of California as its Chief Operating Officer.

28

5.     Plaintiff Edwin de Ferrante ("DE FERRANTE") is an individual, and a resident and citizen of the State of California. At all times relevant hereto, Mr. De Ferrante was over the age of 40 and was employed by GYG US within the State of California.

6.     Plaintiff Chris Armbruster ("ARMBRUSTER") is an individual, and a resident and citizen of the State of Ohio. At all times relevant hereto, Mr. Armbruster was over the age of 40.

7.     Plaintiff Jennifer Henry ("HENRY") is an individual, and a resident and citizen of the State of Texas. At all times relevant hereto, Ms. Henry was over the age of 40.

8.     Defendant Guzman y Gomez (Holdings) Limited is an unlisted Australian public company with Australian Company Number 125 554 743 ("GYG AUS"). Plaintiffs are informed and believe and thereupon allege that GYG AUS holds various trademarks under United States law, including but not limited to "GYG," "Guzman y Gomez," and "Café Hola! By Guzman y Gomez" ("TRADEMARK FILINGS").

9.     Defendant Guzman y Gomez Corp ("GYG US") is a Delaware corporation, formed on or about December 5, 2016. Plaintiffs are informed and believe that thereupon allege that GYG US owns and operates two retail locations under the name "Guzman y Gomez Mexican Kitchen" in the State of Illinois. Plaintiffs are informed and believe that thereupon allege that the President of GYG US is Gaetano Alfred Russo.  GYG US is a citizen of Delaware where it is incorporated and is a citizen of the State of California where the "nerve center" was located.  As the assigned chief executive of GYG US, FULMER, the Chief Operating Officer, lived and principally worked from Orange County, California. FULMER interacted with the team, vendors, and with GYG AUS.  FULMER was responsible for direction of GYG US, spoke with counsel and finance on behalf of the GYG US, all from Orange County, California.

10.     Defendant Steven Marks ("MARKS") is an individual. Plaintiffs are informed and believe that thereupon allege that Marks is a resident of Australia, and that he was the CEO and is a director of GYG AUS.

11.     Defendant GAETANO ALFRED RUSSO ("RUSSO"), aka GUY RUSSO, is an individual. Plaintiffs are informed and believe that thereupon allege that RUSSO is a resident of Australia, and that he is the President and on the Board of Directors of GYG US.  He was also Chairman of the Board of GYG AUS.

12.     Defendant THOMAS DONALD MCKENZIE COWAN ("COWAN"), aka TOM COWAN, is an individual. Plaintiffs are informed and believe that thereupon allege that COWAN is a resident of Australia, and that he is on the Board of Directors of GYG AUS. Plaintiffs are informed and believe that thereupon allege that COWAN is on the Board of Directors of GYG US.

13.     Plaintiffs do not know the true names and capacities, whether individual, corporate, associate, representative, partnership or otherwise, of Defendants named herein as DOES 1 through 50, inclusive, and thus sues these Defendants under fictitious names and capacities. Plaintiffs will amend this Complaint ("Complaint") to allege the true names and capacities of these Defendants when they have been ascertained.

14.     Plaintiffs are informed and believe, and thereon allege, that at all times relevant herein, Defendants, including DOES 1 through 50, and each of them, were agents, partners, parents, subsidiaries, joint venturers, members, shareholders, directors, servants, employees, or affiliates of other Defendants and in doing the things alleged herein were acting in the course and scope of the authority of such agency, service, employment, affiliation, or with the permission, knowledge, approval and consent of the other Defendants in that each and every act of each said Defendant was ratified by the others. Plaintiffs are informed and believe, and thereon allege, that each of the DOE Defendants is responsible in some manner for the unlawful actions, policies, practices, wrongs, injuries and harms alleged in this Complaint, and that Complainant's damages were legally caused by those Defendants, among others.

15.     Plaintiffs are informed and believe, and thereon allege, that at all times relevant herein, Defendants, including DOES 1 through 50, and each of them, agreed to a common plan, scheme and/or design to commit the wrongful acts described herein, and that pursuant to such common plan, scheme and/or design, one or more Defendants did in fact commit such wrongful acts, which resulted in Plaintiffs' damages complained for herein.

## **VENUE**

16.     Venue is appropriate in the County of Orange, because at all times relevant hereto, Plaintiffs FULMER and DE FERRANTE were individuals residing in Orange County, California and Plaintiff's injury occurred in Orange County, California. Additionally, Defendants were, at all relevant times herein, doing business in Orange County, California. Plaintiff is informed and believes and

1    thereupon alleges that the agreement or agreements between Plaintiffs and Defendants were, in part,

2    executed in the County of Orange, State of California, were to be performed in Orange County, California

3    the breaches occurred in Orange County, California.

4                                        **GENERAL ALLEGATIONS**

5        17.    GREG CREED is a 'celebrity CEO.' Mr. Creed, a native of Australia, was the former Chief

6    Executive Officer of Yum! Brands ("Yum!") for several years. Yum! is an American fast-food corporation

7    listed on the Fortune 1000, and operates several well-known brands including Taco Bell, KFC, Pizza Hut

8    and others. Prior to serving as CEO of Yum!, GREG CREED served as CEO of Taco Bell, and ushered it

9    through a period of significant growth and success. In fact, Mr. Creed's success at Taco Bell pushed him

10   into the top job at Yum!.

11       18.    During his years overseeing several major brands in American fast-food, GREG CREED

12   worked with several individuals who contributed to the substantial success of both Taco Bell and later,

13   Yum!, including but not limited to Plaintiffs FULMER, ARMBRUSTER, and HENRY. Plaintiffs

14   FULMER and ARMBRUSTER worked with DE FERRANTE, who worked at YUM! and had a pre-

15   existing consulting practice and technology business catering to quick service restaurant chains.

16       19.    GREG CREED served as the CEO of YUM! for approximately five (5) years. During that

17   time, the stock value of YUM! increased by almost 100%, and YUM! spun off the YUM! China business,

18   creating a new $15 billion dollar company which is listed on the New York Stock Exchange. He instituted

19   many of the principles that YUM! still uses. GREG CREED retired as CEO of YUM! in 2019, the same

20   year named 'Restaurant Leader of the Year' by vote of other restaurant industry CEO's. After his

21   retirement, GREG CREED had a non-compete with YUM! that expired on December 31, 2020.

22       20.    After the expiration of his non-compete at the end of 2020, GREG CREED sought new

23   opportunities for 2021 and to follow, and approached FULMER with the idea of opening a consulting

24   firm to leverage GREG CREED's personal brand and goodwill. The purpose of this new venture would

25   be to apply the lessons and strategies learned from years of turning around major fast-food brands to

26   consult with companies and brands in several spaces, including fast food. Together, GREG CREED and

27   FULMER put together a small team consisting of them, GREG CREED's son TIM CREED who had

28   worked in the corporate world for several years; DE FERRANTE, a visionary marketing specialist who

                                                    4

1    pioneered several data analysis strategies and proprietary technologies in the fast food industry;
2    ARMBRUSTER who had had a long career as a financial analyst and officer with several major fast food
3    brands; and HENRY, the former executive assistant to GREG CREED. CREED UNCO leveraged all of
4    the personal goodwill and captured GREG CREED's rights to publicity due to being named after GREG
5    CREED.

6        21.    Collectively, the team of individuals formed CREED UNCO. CREED UNCO was
7    designed to be '*unco*nventional' and dynamic, and to offer its services while not working in the typical
8    corporate structures of large companies. GREG CREED, TIM CREED, FULMER, DE FERRANTE,
9    ARMBRUSTER and HENRY are all members of CREED UNCO. FULMER, a California resident, is the
10   managing member and Chief Operating Officer of CREED UNCO

11       22.    GREG CREED's success in franchisee-based U.S. and Global restaurant chains was driven
12   by his open and honest approach with *franchisees*, which was a unique approach by a CEO of a restaurant
13   chain. In addition, he consistently delivered on marketing and product launch programs that increased
14   sales and profits in almost every chain he led, resulting in billions of dollars of value and growth over 25+
15   years. Specifically, GREG CREED and his leadership team embarked on an unprecedented level of
16   engagement directly with franchisees, including but not limited to special committees including
17   franchisees to allow them to participate in the planning, and often decision making; making sure that all
18   departments within the brand understood franchisee financials, debt, banking covenants and refinancing
19   strategies; and orchestrating and aligning change that franchisees could support.

20       23.    CREED UNCO's initial strategy involved reaching out to prior contacts, scouring industry
21   trade publications and major media to identify brands that were seeking to expand their business prospects
22   or engineer turnarounds. Almost immediately, they found clients, consulting for well-known national
23   brands such as, among others, Burger King and Panera Bread.

24       24.    Over several decades, franchisees in other restaurant groups became aware of GREG
25   CREED's approach and stabilized success. Franchising is a small world. In addition, many of the people
26   GREG CREED mentored have since moved into other restaurant organizations specifically as a result of
27   working for him and the success of the brands he was involved with, and they mimicked many of GREG
28   CREED's approaches in their various positions.

**Contact with Guzman & Gomez**

25.    In early 2021, GREG CREED received a message from Hamish Douglass, a principal with Magellan Financial Group of Australia ("Magellan"), telling him that Magellan had just purchased a ten percent (10%) stake in an Australian restaurant chain, GYG AUS, which ran several franchised restaurants called "Guzman y Gomez Mexican Kitchen," and that Hamish was working in collaboration with the Board of Directors. Hamish Douglas and GREG CREED had known each other for several years, and Mr. Douglas stated to GREG CREED that he believed that GREG CREED could provide very valuable services to the leadership group of GYG AUS.

26.    Due to his several personal and professional visits to Australia over the years, GREG CREED was familiar with GYG AUS and their food offerings. GYG AUS' locations serve Mexican food, including burritos, nachos and tacos, in a fast-casual setting.  Fast casual is distinct and different from fast food.  Generally, 'fast-food' restaurants emphasize speed of food preparation, a low price-point, often involve precooked or cooked from frozen ingredients, and mass production methods, and usually have a drive-through. Alternatively, 'fast casual' restaurants generally advertise 'higher quality' and made-to-order food, emphasize a dine-in experience (but do not offer table service/waitstaff), have an increased price point and most often do not have a drive-through.

27.    According to the website of GYG AUS, Guzman y Gomez was founded in Sydney, Australia by New Yorkers and childhood friends Defendant MARKS and Robert Hazan. The names Guzman y Gomez purportedly honor the childhood friends of Defendant MARKS and Robert Hazan. The logo of Guzman y Gomez includes an outline drawing of two faces of Mexican male individuals, ostensibly interpreted to be a Mr. Guzman and Mr. Gomez.

28.    On or about March 1, 2021, GREG CREED reached out to Defendant MARKS, the CEO of GYG AUS, through the social media site LinkedIn. MARKS advised GREG CREED in a subsequent phone call that he was aware that Hamish Douglas recommended that MARKS and GYG AUS communicate with GREG CREED. MARKS indicated that GREG CREED could bring credibility to GYG AUS' planned launch in the United States.

29.    Defendant COWAN is on the Board of Directors of GYG US, and is a principal with TDM Growth Partners, a major investor in GYG AUS. Defendant COWAN was involved in and participated in

1    several of the communications with and representations made to Plaintiffs including communication

2    through the means of interstate commerce including, but not limited to, phone conversations and e-mail

3    communications.

4         30.    Throughout April and May of 2021, there were several communications between Plaintiffs

5    and Defendants GYG AUS and MARKS regarding the nature of the relationship between the parties.

6    These communications occurred through the means of interstate commerce including, but not limited to,

7    phone conversations and e-mail communications.  CREED UNCO originally planned only to serve as

8    outside consultants to GYG AUS, consistent with its business model.

9         31.    However, by May 18, 2021, Defendants GYG AUS and MARKS had already decided that

10   they did not want to have CREED UNCO serve only as outside consultants, but rather wanted the

11   Plaintiffs, and each of them, to be, in the words of Defendant MARKS, "all-in." Specifically, Defendants

12   were proposing that Plaintiffs would become investors in GYG AUS, and that GREG CREED would join

13   GYG AUS' Board of Directors.

14        32.    GREG CREED and other Plaintiffs believed that expansion of GYG AUS into the United

15   States was a ground floor, multi-billion-dollar opportunity for the parties.  Even MARKS envisioned GYG

16   having as many locations in the United States as McDonald's.

17        33.    During the courting period, GREG CREED initiated discussions between GYG AUS and

18   YUM! to gauge interest in commercial business alliances.  YUM! opted not to continue to pursue those

19   prospective business alliances and warmly cautioned GREG CREED to a few remaining restrictive

20   covenants in his contracts with YUM! in addition to his non-compete which had expired on December 31,

21   2020.

22        34.    To avoid any potential or perceived violations of restrictive covenants in contracts with

23   YUM! and even though non-compete restrictions already expired on December 31, 2020, GREG CREED

24   individually chose not to consult with, perform any services for, work for or join the board of GYG AUS

25   until March, 2023 when all restrictive covenants with YUM! would have expired. GYG AUS agreed as

26   well that GREG CREED's onboarding would be in March 2023. Plaintiff FULMER, a California citizen,

27   as Managing Member and Chief Operating Officer of CREED UNCO, served as the lead on the GYG

28   project during this time.

**The Parties Formalize The Business Relationship**

35.    Defendants, and each of them, referred to Plaintiffs as the "NALT," an acronym for the North American Leadership Team.

36.    In June, 2021, Defendant COWAN, by and through TDM Growth Partners, caused to be issued a Memorandum to the Board of Directors of GYG AUS ("TDM 2021 Memorandum"), explaining that Plaintiffs (the NALT) would be leading the US business together, that Plaintiff GREG CREED would be joining the GYG AUS Board, and that it was the intent that the Plaintiffs (the NALT) receive 10% of the value created in the US subject to agreed hurdles being met. A true and correct copy of the TDM Memorandum is attached hereto as Exhibit "A."   The board of GYG AUS approved this Memorandum and agreed to provide Plaintiffs with 10% of the value created in the US subject to agreed hurdles being met. This was communicated to Plaintiffs by an email dated September 28, 2021 from COWAN to GREG CREED and MARKS, and written on behalf of GYG AUS, and was a material inducement relied on by Plaintiffs, and each of them, in taking the actions as hereinafter alleged.

37.    The TDM 2021 Memorandum misappropriated CREED UNCO and GREG CREED's right of publicity (or in Australia, the tort of "passing off") when it was sent to some 54 other shareholders of GYG AUS leveraging the name and brand of GREG CREED in the franchise industry resulting from his celebrity CEO career at YUM! brands. Magellan used the misleading attribution and mischaracterization of CREED UNCO's involvement with GYG AUS to trade and sell all of its stock in GYG AUS at an incredible profit, creating a benchmark for measuring value that GREG CREED's personal brand made to the stockholders of GYG AUS.   GYG AUS never paid CREED UNCO for use of GREG CREED's name, the entity that was entitled to any monetary gain derived from GREG CREED's brand and likeness, and gain that was to split and shared with all the employed Plaintiffs.

38.    Throughout June, July and August of 2021, Plaintiffs (excluding GREG CREED) worked diligently and extensively to prepare a strategy and business plan for a growth business model and plan (the "NALT Business Plan") for GYG AUS to rapidly and intelligently expand in the United States, through their subsidiary GYG US. CREED UNCO was asked to sign formal Non-Disclosure Agreements in order to access an online 'data room' with GYG AUS' documentation and financial information. Plaintiffs prepared several documents and held multiple calls, through the means of interstate commerce,

with Defendants MARKS to address a growth plan of GYG US' operations, including business models, supply chain issues and development plans. The NALT Business Plan had six (6) major components or business points to follow to assure success of GYG locations in the USA ("SIX POINTS"):

> 1.) Attract large, big franchisees and not pursue smaller franchisees. Only experienced professional franchise owners who are known entities in the industry. CREED UNCO already had 25 prospects identified.

> 2.) Invest at least USA$30 million to open up at least ten marquee locations with five locations in at least two markets to showcase the locations and metrics for growth. Expanding in Chicago where GYG AUS had already chosen would be too difficult, but to honor the founders' original mission in the USA, a few locations would be opened in the Chicago area with a target of fifteen total locations within the USA$30 million budget. CREED UNCO identified Crystal Lake, Illinois as a prospective location over GYG AUS leadership objections. The location just opened recently, executing on the NALT plan, with wild success beating every record that GYG AUS ever had. GYG US (driven by RUSSO) initially rejected the location but later recanted based on the persuasion and persistence of the NALT.

> 3.) In the USA market, GYG US would need to create a hybrid of its 'fast casual' elements (high quality, higher price, authentic flavors) and its 'fast-food' elements (drive-thru ordering convenience and speed of service), to compete primarily with Chipotle and other fast casual brands, and not be confused as an expensive fast-food restaurant. To be successful, the buildings would need to be differentiated from traditional fast-food buildings. In addition, a hub and spoke approach would be used to first introduce the brand to "hipper", "trendier" hub areas (located in more urban areas that usually don't allow for a drive-thru) and then to drive-thru friendly, suburban areas (the spokes), with the goal to define the brand as fast casual "cool" with fast-food like convenience.

> 4.) Establish and develop USA branding essence of GYG brand that could be used globally but was required for CREED UNCO involvement in the USA, including color palettes and better positioning GYG brand relative to other brands. In Australia, there are not many

Mexican food chains, but in USA, the brand would have to be highly competitive. As part of brand essence, CREED UNCO insisted on better food photography to be competitive with Chipotle, avoiding casual, impulsive cell phone photos.  Revision of GYG brand would be necessary to meet all the elements of growth and sustainability in the USA market, including avoiding cancel culture movements by removing racist undertones of two Mexican appearing faces from the logo unless they were grounded in actual humans and factual truths that could be substantiated. The CREED UNCO team was concerned about cultural reactions and competition stoking the "cancelling" GYG AUS's brand in the USA, comparing it to Cheech & Chong, Aunt Jemimah, Sambo's and Washington Redskin logos. Also crucial to brand essence was establishing marketing and loyalty programs that would contribute to the ongoing success for each location and customer loyalty across all locations.

5.) Establish franchise-friendly profit and loss financials, with building design, food prices and supply prices that increase predictability and certainty in franchises achieving certain financial metrics, and tap into the CREED UNCO teams' vast franchise relationships, built over the years, to yield rapid, knowledgeable and capable partnerships with both the money to invest and the expertise to grow the brand quickly in USA.

6.) All Plaintiffs would invest money (collectively, USA$6.8 million) to receive 1% ownership of GYG AUS at a fixed per share price (commonly referred to as the Magellan price) and GREG CREED would join in March 2023.

39.    GYG AUS viewed Plaintiffs as a pathway towards a global acquisition strategy on a sell-side or exit strategy for shareholders; namely that GREG CREED would be able to help grow and later sell the entire enterprise.  GREG CREED knew leaders in the quick service restaurant industry globally, improving GYG AUS's attractiveness as a future target for buy-out acquisition, further creating more value of GYG AUS.  Because of the prospect, GYG AUS's Board of Directors and certain key shareholders individually and collectively participated in reviewing and scrutinizing the NALT Business Plan that hinged on these SIX POINTS.

1      40.    ARMBRUSTER's standing in the restaurant and finance industry was also unique.

2   ARMBRUSTER had done several hundred transactions of onboarding and transitioning franchisees over

3   his 25-year career. ARMBRUSTER is well known by every financial institution that supports franchisees.

4   ARMBRUSTER was instrumental in the first private equity transaction in the franchising industry, which

5   is a valid and continued approach to this day.  His ability to discuss and show the benefits of running a

6   GYG US franchise in a manner that franchisees would embrace was unprecedented.  ARMBRUSTER

7   understood the complexity and was able to make is simple and functional for franchisees to succeed.

8      41.    Initially RUSSO, COWAN, MARKS and the Board of Directors didn't accept the NALT

9   Business Plan and SIX POINTS, mainly because of GYG AUS's success in Australia opening up locations

10   with smaller franchisees and less experienced operators. The growth plan was very expansive and much

11   more aggressive than expected.

12      42.    But after weeks of review and meeting with CREED UNCO, the Board (including

13   MARKS, RUSSO and COWAN) changed its position on the NALT Business Plan and SIX POINTS,

14   adopting them and instructing GYG AUS to proceed with business relations with CREED UNCO and

15   Plaintiffs, and each of them.  This was communicated to the NALT side in phone calls and e-mails in the

16   late August to October 2021 time frame with MARKS and COWAN, where they acknowledged that they

17   were looking forward to going forward with the NALT and the SIX POINTS.

18      43.    The NALT Business Plan was material to the overall decision of the Plaintiffs to work with

19   GYG US and turned on each of these SIX POINTS which was clearly and unambiguously communicated

20   to GYG AUS by Plaintiffs. Every piece of work from March through September of 2021 was done with

21   the message of "do not hire us if you are not going to follow the SIX POINTS."  The agreement to follow

22   the SIX POINTS was the most important reason the NALT group agreed to become employed with GYG

23   US at reduced compensation and put off their own plans to expand CREED UNCO.  This was the most

24   material fact in the NALT group's agreement to join as employees of GYG US and cease all other work

25   for CREED UNCO including its work for Burger King, thus sacrificing all business and goodwill that had

26   been created for CREED UNCO, to devote their full-time attention to GYG US and be "all in" as required

27   by GYG AUS.

28

1    44.    The significance of the NALT Business Plan is that once metrics were achieved, family

2    offices and deep-pocket professional franchise owners with vast experience in the fast-casual and fast-

3    food industries would be willing to contract with GYG AUS to pen 30-50 locations at a time, allowing

4    scaling of locations to 500 locations rapidly.    Plaintiffs have extensive contacts within owners of

5    franchises, and these investors and owners would have considered purchasing and expanding GYG

6    locations once certain metrics were proven at the initial planned locations.

7    45.    Upon achieving 200 GYG locations in the USA, GYG AUS's enterprise value would more

8    than double through implementing the NALT Business Plan, from GYG AUS's self-identified value of

9    AUD$1.5 billion to, conservatively, AUD$5 billion in 5 years.

10    46.    On or about September 1, 2021, and after the Board's approval of the NALT Business Plan

11    and SIX POINTS, Defendant GYG AUS, by and through a Member of their Board of Directors, Defendant

12    Cowan, outlined a proposal to Plaintiffs whereby Plaintiffs would become employees of GYG AUS (rather

13    than serving as consultants), that each of the individual Plaintiffs would be entitled to obtain a portion of

14    a collective one percent (1%) stake in GYG AUS ("AUS SECURITIES"), and that each of the individual

15    Plaintiffs would be able to participate through a perpetual long term profit interest in the US operations

16    by Plaintiffs based on 10% of the overall footprint in the USA market ("PARTICIPATION

17    SECURITIES") with 5% (or 50% of 10%) fully and unconditionally vested immediately upon exclusive

18    commencement by the NALT's efforts as employees (excluding GREG CREED).    Corresponding with

19    the offer of the PARTICIPATION SECURITIES, the offer of the AUS SECURITES was pitched by

20    COWAN, MARKS and RUSSO as a more favorable (lower) valuation together with the offer of

21    PARTICIPATION SECURITIES and adoption of SIX POINTS corresponded to and was relied upon by

22    each of the individual Plaintiffs (other than GREG CREED) agreeing to be employed by and taking a

23    lesser base compensation from GYG US. The representations as to the AUS SECURITIES' value was a

24    misrepresentation by COWAN, MARKS and RUSSO, and each of them, as the actual value was less than

25    represented (given that later the liquidation rights or sale rights to sell the AUS SECURITIES, was much

26    less favorable due to illiquidity of the investment).

27    47.    Plaintiffs carefully considered these proposals, including adoption of the SIX POINTS,

28    offers of AUS SECURITIES and offers of PARTICIPATION SECURITIES.    Several email

communications were sent back and forth between Plaintiffs and Defendants regarding terms and proposals. On or around November 1, 2022, Defendant COWAN, by and through his company TDM Growth Partners, sent Plaintiffs a slide deck entitled "Framework for GYG US Leadership Team Equity Participation." A true and correct copy of this document is attached hereto as Exhibit "B." This document contains a formal offer of the PARTICIPATION SECURITIES and states that the NALT will receive shares in GYG Holdings based on sharing in 10% of the value that is created in the GYG US business.

48.    Because of the tremendous upside of expanding GYG into the United States which only needed $30 million of investment to ascertain and achieve AUD$3.5 billion value, and possibility of thereafter growing to AUD$10 billion to AUD$20 billion in increase to the overall enterprise value to the AUS SECURITIES, NALT viewed the opportunity to receive more shares in GYG AUS based on 10% of the overall value in the USA market (the PARTICIPATION SECURITIES") as a huge potential to acquire much more of GYG AUS and profit from (i) investment in AUS SECURITIES, (ii) less base or annual compensation, and (ii) foregoing other business opportunities (e.g., Burger King, Panera, etc.) and shutting down CREED UNCO.

49.    In November 2021, the minimum vesting schedule that GYG offered NALT members was at least 5% of the potential 10% (50% or half) of the value that is created in the GYG US business (i.e., the PARTICIPATION SECURITIES) to be fully vested immediately, with the opportunity for additional tranches of 2.5% vesting based on achieving milestones.  Individual PLAINTIFFS were given the discretion to allocate and apportion the 10% amongst them as they determined as a group.  While the group had the ability to apportion or allocate such amount, it was always considered that at least 50% of the 10% (or a full 5%) was fully vested in November 2021.  GYG unilaterally modified this arrangement in their favor when as part of the INCENTIVE SECURITIES [defined and discussed in further detail below]. GREG CREED was not issued any INCENTIVE SECURITIES and there was an understanding that 22% of the 10% of the PARTICIPATION SECURITIES (resulting in a personal 2.2% interest in the value that is created in the GYG US business) would be held back in reserve for him for when GREG CREED commenced employment).

///

///

50.     Plaintiffs expected and they were promised at least 50% fully vested participation in the PARTICIPATION SECURITIES at the time employment commenced and when the USA$6.8 million investment by Fuller 74 took place.

51.     The PARTICIPATION SECURITIES were unique because of NALT's experience in working for large franchises and quick service restaurants, they had the ability to participate on percentage of the overall growth of the United States market. This made the PARTICIPATION SECURITIES extremely attractive and lucrative due to PLAINTIFFS being on the "ground floor" of entry into the United States market and following the SIX POINTS and NALT Business Plan assured that GYG would follow the strategies necessary to be successful in the United States market.

52.     Defendants and Plaintiffs viewed PARTICIPATION SECURITIES as a separate security and investment contract, distinct from the direct acquisition of GYG AUS SECURITIES.

53.     Plaintiffs viewed the PARTICIPATION SECURITIES in a manner whereby the longer the PARTICIPATION SECURITIES did not convert into GYG AUS securities, the more valuable and the greater percentage of number of shares of GYG AUS SECURITIES the PLAINTIFFS would receive. As a result, the NALT was not eager to negotiate a share cap, share pool or any earlier conversion feature of the PARTICIPATION SECURITIES into GYG AUS SECURITIES and liked the open-ended nature of the conversion feature that was offered and agreed upon by COWAN, MARKS and RUSSO.

54.     Typically incentive or participation plans are cash-based or with respect to shares of a company, involve a pre-determined number of shares to assure compliance with (i) anti-dilution provisions of certain corporate financings, (ii) determination of pre and post-money valuations for purposes of the Board of Directors discharging fiduciary duties in connection with offering and selling securities, and (iii) compliance with applicable securities laws in the United States, California, Ohio, Tennessee and Texas. Also, an approach for participation rights is typically prepared, offered and sold in a manner that has a methodology for determining a value for conversion into shares of the underlying securities. Despite all the resources available to Defendants, including working with law firms like DLA Piper and Sidley Austin, Defendants failed to produce, provide and document the PARTICIPATION SECURITIES prior to the PLAINTIFFS accepting the general terms of the PARTICIPATION SECURITIES and providing services at reduced compensation amounts, shutting down CREED UNCO

1    and investing USA$6.8 million. GYG AUS accepted all such consideration, and not only knew CREED

2    UNCO would be shut down, but negotiated for and insisted that to be the case.

3          55.    Plaintiffs believe that the PARTICIPATION SECURITIES as agreed upon constituted

4    property under Internal Revenue Code Section 83(a), granting perpetual ownership rights to GYG location

5    until exchanged or converted into AUS SECURITIES.

6          56.    The parties viewed the PARTICIPATION SECURITIES in simplistic terms, if the US

7    Market expanded to AUD$2 billion based on location value of $3 million each, NALT would receive

8    $200 million in GYG AUS stock. However, and to the NALT's benefit, if the US Market quickly

9    expanded to AUD$20 billion, NALT members would be entitled to receive AUD$2 billion of GYG AU

10   stock. Indeed, at one point, MARKS had asserted and claimed to Fulmer that GYG locations would match

11   and exceed the number of McDonalds locations in the United States.

12          a.    The NALT members understanding was that if the Australian value of GYG AUS

13               was AUD$5 billion and United States value was AUD$2 billion, the combined value would be

14               AUD$7 billion, of which NALT members would own AUD$200 million from the

15               PARTICIPATION SECURITIES or 2.857% of GYG AUS (AUD$200 million divided by AUD$7

16               billion). This would be in addition to the 1% already purchased by Plaintiffs through Fuller 74 for

17               the USA$6.8 million investment. In aggregate, the total amount of GYG AUS SECURITIES

18               would be valued at AUD$269 million.

19          b.    Another following example highlights the enticement and inducement to NALT

20               members since the USA market always is expected to fully eclipse the current and future value of

21               the Australian market. If the value of GYG AUS due to the Australian market was AUD$3 billion

22               and United States value was AUD$5 billion, the combined value would be AUD$8 billion, of

23               which NALT members would own AUD$500 million from the PARTICIPATION SECURITIES

24               or 6.25% of GYG AUS (AUD$500 million divided by AUD$8 billion). This would be in addition

25               to the 1% already purchased by Plaintiffs through Fuller 74 for the USA$6.8 million investment.

26               In aggregate, the total amount of GYG AUS SECURITIES would be valued at AUD$580 million.

27          57.    In summary, the NALT members believed the floor value of the PARTICIPATION

28   SECURITIES would be USA$60 million, with a likelier value of $150 million, and with an upside

1   potential of more than USA$300 million. This would explain why PLAINTIFFS proceeded to be
2   employed at reduced compensation, shut down CREED UNCO and invested USA$6.8 million.

3          58.    NALT members were led to reasonably believe that obtaining 1% of GYG AUS for
4   USA$6.8million would put NALT in the position to increase the value of such investment and those
5   securities to US$37.8 million within five years with no downside risk (other than risks arising from
6   circumstances that GYG AUS and NALT members could not control) since the GYG AUS would
7   maintain or grow in value within Australia notwithstanding any outcome in the United States. However,
8   NALT members never intended to invest in an illiquid, overseas investment and would not have invested
9   in the AUS SECURITIES for the sole purpose of any growth potential of GYG AUS in Australia, only
10  making such investment through Fuller 74 in connection with receipt of the PARTICIPATION
11  SECURITIES.

12         59.    At all times preceding the AUD$6.8 million investment by Fuller 74, NALT members
13  believed that GYG AUS would implement the NALT Business Plan and follow the SIX POINTS. The
14  NALT members did not expect GYG AUS to fail to implement and follow the NALT Business Plan and
15  SIX POINTS with respect to the launch in the United States.

16         60.    Without fully coming to a final agreement on all aspects, but based on Defendants
17  representations that the full beneficial terms would be worked out, in September of 2021, and because
18  GYG AUS Board of Directors adopted the NALT Business Plan that included all SIX POINTS, Plaintiffs
19  accepted employment with Defendants at a lesser base compensation, and  Plaintiff CREED UNCO was
20  forced to terminate its other clients and abandon its business plan in order to be "all-in" with Defendants.

21         61.    Cowan and the Board informed shareholders and investors of GYG AUS that GREG
22  CREED and Plaintiffs were joining GYG AUS and running the USA market.

23         62.    Even though the decision had been made for Plaintiffs to invest in AUS SECURITIES, in
24  October, 2021, Defendants made a suggestion to Plaintiffs that in order to cleanly hold the 1% investment
25  in GYG AUS amongst Plaintiffs, they should form a single limited liability company to be the 1% owner.
26  ///
27  ///
28  ///

63.    Given the fraud and deception that took place, Plaintiffs believe that Defendants (through suspect advice of advisors) requested the consolidation to circumvent USA securities laws, especially with respect to non-sophisticated individual Plaintiffs.

### Plaintiffs' Work with Defendants As Employees

64.    Plaintiffs FULMER, TIM CREED, DE FERRANTE, and ARMBRUSTER were formally made employees of GYG US effective November 1, 2021, and HENRY became an employee on January 1, 2022. The written agreements for employment provided that Defendant GYG US was offering employment to Plaintiffs, and that such employed Plaintiffs would be "…initially reporting to Global CEO, Steven Marks."

65.    The employment agreements included an "Exclusivity" provision requiring Plaintiffs to devote substantially all of their business time, attention and energy to Defendant GYG US.

66.    The employment agreement with ARMBRUSTER demonstrated a knowledge of the specific nature of the NALT Plan by leadership at GYG AUS and its attorneys/advisors since it defined that ARMBRUSTER would be working in 'fast casual,' and was not asked to engage in any 'fast food' market activities which would have been in direct conflict with his disclosed duties as a board member to a separate company engaged in the fast-food business that may have been considered a competitor. ARMBRUSTER did not want GYG US to successfully interfere with written agreements which GYG US was intentionally attempting to interfere and breach.

67.    Plaintiff GREG CREED would not be immediately hired due to prematurity of expansion and traction in the USA. The NALT team needed to first garner traction through opening locations before publicly announcing to the USA market (and potential franchisees). However, it was understood, GREG CREED would be hired as an employee of GYG US by March 2023, that he would become a member of the Board of Directors of GYG AUS, and that GYG AUS and GYG US would capitalize on GREG CREED's name recognition to advance their business in the United States.

68.    No later than November 11, 2021, Defendant GYG AUS made proposals to Plaintiffs that, in addition to employment and a 1% share in GYG AUS, that Plaintiffs (identified as the NALT), would receive shares in GYG US based on sharing in 10% of the value that is created in the GYG US business.

1  Follow up proposals were made in December, 2021 by Defendants. This was all relied on by Plaintiffs,
2  and each of them (other than GREG CREED) in continuing as employees for a lesser base compensation.

3      69.    Throughout November, 2021 through May, 2022, Plaintiffs did extensive work to benefit
4  Defendant GYG US' operations and growth plans. At the time, GYG US had one single location in the
5  United States, located in Naperville, Illinois.

6      70.    Plaintiffs worked on identifying specific markets that Defendant GYG US should expand
7  into, particularly identifying Charlotte, North Carolina as a market to focus on. Plaintiffs also worked on
8  identifying potential franchise operators, potential vendors, marketing plans and business growth plans.
9  Plaintiffs continued to make growth plans in the Chicago area, in parallel to new market development.

10     71.    For example, in May of 2022, Plaintiffs engaged Harrison Design firm to help design new
11  locations for Defendant GYG US, which would both create a unique design for the locations while also
12  reducing costs. Plaintiffs also engaged a professional chef on a consultancy basis to review the operations
13  at the Naperville location and give suggestions. Plaintiffs also hired a financial expert to help all parties
14  get a better handle on the financials of the US operations and interact with the Australian finance team for
15  Defendant GYG AUS.

16     72.    Plaintiffs also advised Defendant Marks that Defendant GYG US should *not* utilize the
17  existing logo involving two faces of male individuals purporting to be Mr. Guzman and Mr. Gomez, the
18  namesakes of the restaurants. Plaintiffs advised that these drawings would possibly be considered racist
19  in US markets. This was especially so after Plaintiffs discovered that the story told by Defendant Marks,
20  and which was at least in part relied upon by Plaintiffs and each of them in taking the actions as herein
21  alleged, which is that the restaurants were named after the fathers of his childhood friends, was a complete
22  fabrication, and that the two faces in the logo were simply generic drawings of Mexican-looking men.

23     73.    On or about May 26, 2022, the Board of Directors of GYG AUS approved the presentation
24  provided by Plaintiffs with a five-year business plan for Defendant GYG US.

25     74.    In June, 2022, Defendant GYG US sent to Plaintiffs, and each of them, a document titled
26  "Offer to Participate in the Guzman y Gomez 2022 US Employee Long Term Incentive Plan (Offer)
27  [referred to hereinafter as the "LTIP"], which constituted the written recitation of terms for the
28

1  INCENTIVE SECURITIES. A true and correct copy of one LTIP, partially redacted for privacy reasons,

2  is attached hereto as Exhibit "C."

3      75.    Because of the tremendous value that PARTICIPATION SECURITIES provided

4  individual PLAINTIFFS, GYG AU engaged in a deceptive change to the investment contract by creating

5  the INCENTIVE SECURITIES. MARKS, RUSSO, through help with other officers and advisors to be

6  determined, recast the PARTICIPATION SECURITIES into the INCENTIVE SECURITIES, citing tax

7  concerns due to phantom tax that could be incurred by the parties for the compensatory nature of the stock

8  issuances that would take place upon conversion of the PARTICIPATION SECURITIES. In other words,

9  Plaintiffs are now informed and believe and allege that a conspiracy took place to deceive and mislead

10 PLAINTIFFS into agreeing to accepting the INCENTIVE SECURITIES with no ascertainable value after

11 CREED UNCO was shut down and the individual Plaintiffs had already been receiving lower

12 compensation. In particular, none of the tax concerns that were touted as preventative, actually reduced

13 the tax implications that arose from the PARTICIPATION SECURITIES since exactly the same tax

14 implications continued to exist in the exact same nature with the INCENTIVE SECURITIES. That means,

15 the only purpose of recasting the PARTICIPATION SECURITIES to INCENTIVE SECURITIES was to

16 continue to defraud and deceive the PLAINTIFFS with more favorable business terms than those set forth

17 in the PARTICIPATION SECURITIES.

18                    **Misleading INCENTIVE SECURITIES**

19      76.    In June 2022, well after employment had begun and CREED UNCO's business had been

20 shut down, GYG AU produced a document MARKS claimed intended to capture the spirit and nature of

21 the PARTICIPTATION SECURITIES, attached hereto as Exhibit C ("LTIP Offer"). Each LTIP Offer

22 purported to be issued pursuant to US Employee Long Term Incentive Plan Rules ("Missing Rules") that

23 were never provided to Plaintiffs. The LTIP Offer was presented to each individual Plaintiff and each

24 LTIP Offer self-proclaimed the existence and creation of a US Employee Long Term Incentive Plan

25 ("Missing Plan"). At no time did GYG AU ever produce the Missing Plan or the Missing Rules. The

26 LTIP Offers are referred to herein as the "INCENTIVE SECURITIES."

27      77.    Each LTIP Offer appears to be identical except that the term "AP" or allocation percentage

28 applicable to each employed Plaintiff varied pursuant to the participation in the PARTICIPATION

SECURITIES that the CREED UNCO team members included. The total APs issued was left a reserve of 2.2% for GREG CREED, evidencing the intention in June 2022 and deceptive messaging and communication to the employed Plaintiffs that GREG CREED would be hired in March 2023 and receive the remaining reserved AP of 2.2%.

78.    Each LTIP Offer is a security under applicable securities laws. The LTIP Offer defined itself as "Offer' and constituted an investment contract separate and apart of the AUS SECURITIES.

79.    The LTIP Offers confirmed the valuation methodology that GYG AU viewed for the enterprise organization, mainly 3.5 times annual total revenues.    In other words, if 200 locations in the United States were generating AUD$350 million, the total value of US business would be AUD$1.05 billion.

80.    The LTIP Offers were also misleading because the cleverly drafted exchange/conversion feature into the AUS SECURITIES did not employ the same valuation methodology of valuing the Australia business and global business by using 3.5 times the revenues. Plaintiffs believe this is the case since the value of the US business would increase faster relative to the Australian business given higher food prices and average revenues expected per store.    Instead, the drafters intentionally deployed a different valuation methodology for the exchange feature by using an ambiguous fair market value methodology.    Having a different calculation for exchange rate into AUS SECURITIES from the determination of the value to be exchanged demonstrates that GYG AUS never intended on issuing the AUS SECURITIES pursuant to the LTIP Offers and that the INCENTIVE SECURITIES were deceptive and misleading. If GYG AUS intended on issuing the underlying AU Securities, a very simple formula of 3.5 times all revenues of the global company would have been used for the exchange ratio. At the very least, the failure to deploy such a simple methodology proves on its face negligence by GYG AUS and potentially malpractice by the legal advisor who drafted the document. If the legal advisor suggested the simple formula and GYG AUS was concerned about the value that Plaintiffs receive and asked for a tougher exchange ratio, it evidences intent by GYG AUS to harm and damage Plaintiffs. This very important calculation difference was cleverly conceived and misleading, which attorneys and MARKS prepared with intent to deceive and mislead Plaintiffs.

///

81.     Each LTIP Offer was also misleading in that the Entitlement Section expressly informed employed Plaintiffs that "OS means the number of ordinary shares in the Company you will be issued (rounded down to the nearest whole number). However, the document later states that the Board could unilaterally, and at its discretion, not issue any shares of AUS SECURITIES if there is a tax withholding requirement for the compensatory nature of the taxes, which clearly would be the case. In other words, the tax liability of the future AUS SECURITIES would be so large and burdensome (because of payroll tax and employer matching requirements) that neither GYG AUS nor the Plaintiffs could handle the liquidity needed to withhold and remit amounts due on the tax liabilities. MARKS most likely was informed of this terrible structure since he attempted to communicate the tax concerns to Plaintiff but then failed to structure INCENTIVE SECURITIES to take advantage of Internal Revenue Code Section 83(b), permitting the employed Plaintiffs to make a thirty (30) day election to treat the issuance of INCENTIVE SECURITIES as property received then under Internal Revenue Code Section 83(a). The failure to restructure the securities to fall within Section 83 of the Internal Revenue Code (through use of issuance of securities in GYG USA entity or another tracking entity for US owners [such as a de-SPAC or UP-C structure] used in private international cross-border ownership structures involving massive markets like the United States to assure compliance with securities laws while addressing business and tax matters) is evidence of malpractice of the lawyers and advisors working with GYG AUS, or an intention by GYG AUS to never issue the AUS SECURITIES in the future pursuant to the LTIP Offers.

82.     Even though the LTIP Offers contemplated full vesting after five years, such feature was only agreed upon by Plaintiffs since Defendants COWAN and MARKS said that sooner vesting would constitute a taxable event, which, based on the unascertainable LTIP exchange calculation, was not possible. As a result, the whole basis of pushing the vesting out to five years was a lie. MARKS misled Plaintiffs when stating that having earlier vesting documented in the LTIP Offers would cause adverse tax consequences. The reality is that the entire structure on its face would result in adverse tax consequences regardless.

83.     The LTIP Offers also demonstrated a failure by attorneys to advise on proper joint venture structures or tracking entity for US owners to permit use a partnership structure and issuance of a profit interest that is a separate security issued by the entity, that can later have rights to exchange into publicly

traded securities to permit liquidity upon date of conversion or in the future sale of GYG AUS, or when a public market existed for AUS SECURITIES (e.g. de-SPAC or Up-C structure). In other words, GYG AUS and its advisors ignored simple, standard and legal tax avoidance strategies in structuring the INCENTIVE SECURITIES, demonstrating that GYG AU was negligent, breached fiduciary duties and intentionally designed the INCENTIVE SECURITIES so that Plaintiffs would never be issued any shares of AUS SECURITIES based on performance in the United States.

84.    The LTIP Offers and Missing Plan failed to cap the total shares under the Missing Plan at 20% of the total outstanding shares of GYG AU in accordance with contractual restrictions on GYG AU, evidencing malpractice and that the INCENTIVE SECURITIES were not validly issued or authorized.

85.    Plaintiffs are informed and believe and thereupon allege that the lack of care and failure to provide Plaintiffs the Missing Plan and Missing Rules demonstrates an internal sloppiness at GYG AUS, and violation of the fiduciary duty of care by all executives and directors generally, in connection with business hygiene.

86.    Plaintiffs are informed and believe and thereupon allege that no law firm would have issued a legal opinion that the INCENTIVE SECURITIES were validly issued and duly authorized, given the uncertainty caused on the capitalization table of GYG AUS and the existing shareholder agreements, despite the LTIP Offer being presented to Plaintiffs as a valid and enforceable document. A valid legal opinion would have at least required the Missing Plan and Missing Rules be prepared and included.

87.    Plaintiffs are informed and believe and thereupon allege that no law firm would have issued a legal opinion that the INCENTIVE SECURITIES were issued in compliance with all applicable securities laws despite the LTIP Offer being presented as a valid and enforceable document. It stands out that the entirety of the security remains a mystery because of the Missing Plan and the Missing Rules.

### Defendants Maintained A Workplace Culture of Ageism

88.    Soon after their employment with Defendant GYG US commenced, Plaintiffs became aware of a workplace culture that was hostile to individuals, both employees and non-employees, over the age of 40. This culture was led and actively promoted by, among others, Defendant MARKS.

89.    Throughout their employment, MARKS made comments directly to Plaintiffs FULMER, DE FERRANTE, ARMBRUSTER and HENRY about their ages and his misguided perception that, as

1  older employees, they lacked the "energy" to complete their job duties. MARKS also consistently berated
2  these Plaintiffs for being "slow," lacking "energy," and doing things "the old way" and refusing to change.

3       90.    Defendants' prejudice against individuals over 40 also manifest in his communications to
4  employees, including Plaintiffs, about the Company's customers. For example, at the January 2023
5  opening of the Schaumberg, Illinois location, attended by Defendant MARKS and the Chief Marketing
6  Officer for Defendant GYG AUS, Lara Thom, Lara Thom, in the presence of MARKS, made several
7  comments to Plaintiffs DE FERRANTE and FULMER that there were "too many old people coming in"
8  and that "they are not a great face of the brand." In the same vein, MARKS told them, "I'm happy to serve
9  them but I want to see young people in the restaurant." At this opening, Defendant GYG US was also
10  giving away T-shirts at the event, but Lara Thom, again in the presence of MARKS, made statements such
11  as "we don't give t-shirts to fat people." MARKS was present for, made no effort to correct, and therefore
12  ratified, Ms. Thorn's comments. Indeed, in response to DE FERRANTE's expressed concerns, MARKS
13  told him, "we don't have old people in Australia."

14       91.    MARKS also made these sorts of discriminatory comments about these Plaintiffs to others.
15  For example, in his phone communications with Plaintiff TIM CREED in or about January and February
16  2023, as mentioned above, Defendant MARKS told Plaintiff TIM CREED—the only one of the Plaintiffs
17  under the age of 40—that he did not believe that the other Plaintiffs had "the energy to take the brand to
18  the next level" and that those Plaintiffs did not "bring the energy or youthfulness" that Defendant MARKS
19  was looking for.

20       92.    Furthermore, MARKS made it clear to all of the Plaintiffs that age was his primary criteria
21  in hiring employes. Plaintiff TIM CREED worked closely with MARKS regarding hiring for new
22  locations. On multiple occasions, MARKS rejected job applicants solely based on their advanced age,
23  telling TIM CREED repeatedly that he was looking for employees "in their mid-30's" who were
24  "energetic." MARKS' prejudice towards older job applicants and employee was well-known. Indeed, at
25  one point, Ms. Thom once told Plaintiff TIM CREED that MARKS "says this stuff all the time; he
26  shouldn't say it." Even though MARKS attempted to indoctrinate TIM CREED, TIM CREED would not
27  play by his rules and would be subsequently terminated when MARKS did not think TIM CREED would
28  aid and abet in MARKS discriminatory conduct.

**Defendants Change the Nature of the Relationship and Finally Terminate Plaintiffs**

93.    Beginning in early 2022, Plaintiffs became informed and believe that Defendant Marks was on some type of forced sabbatical from Defendant GYG AUS, imposed by the other Directors of Defendant GYG AUS, due to Defendant Marks' ever-shifting positions, arbitrary changes and decision making, unstable, dishonest, illegal and unethical behavior, and capricious actions within the company.

94.    During this time, Defendant Marks would arbitrarily change his mind on certain company decisions that he had approved previously, such as pursuing the Charlotte market. Also around this time, Defendant Marks decided that he believed that Australian beef was superior to American sourced beef, and that Defendant GYG US' operations should utilize imported Australian ground beef. Such a decision would substantially increase the costs and inconsistency of restaurant operations in the US locations.

95.    Defendant MARKS would make statements such as "You guys (referring to Plaintiffs) don't understand the brand like I do."

96.    Defendant MARKS would further indicate by his comments to Plaintiffs in meetings that it was his belief that Plaintiffs were "too old" and that he wanted "younger people" involved with his restaurants, including both employees and customers.

97.    Defendant MARKS also breached his prior agreement with Plaintiffs to change the logo utilized by Defendant GYG US, despite Plaintiffs' advice that it was racist.

98.    Around this time, Defendant MARKS made statements to Plaintiffs stating his belief that GYG US would *replace* both McDonalds and Taco Bell in the US within 20 years. McDonald's currently has approximately 13,000 locations in the US, and Taco Bell has approximately 7,000 locations in the US.

99.    In approximately October, 2022, and following a particularly tumultuous meeting between Plaintiffs and Defendant MARKS, Plaintiff ARMBRUSTER's employment with Defendant GYG US was constructively terminated when he quit due to agism, illegal discrimination, violation of labor laws and breach of Defendants' promise to remain in the fast casual market.

100.    Plaintiffs continued to diligently work to make Defendant GYG US a success. In approximately January, 2023, a second location was opened in Schaumberg, Illinois, piloted by Plaintiffs (the NALT). The opening was attended by Defendant MARKS and the Chief Marketing Officer for Defendant GYG AUS, Lara Thom. This was the event where Ms. Thom made statements that there were

1  "too many old people coming in" and that "they are not a great face of the brand." Defendant GYG US

2  was also giving away t-shirts at the event, but Lara Thom, again in the presence of MARKS, made

3  statements such as "we don't give t-shirts to fat people," which was discrimination under the American

4  with Disabilities Act ("ADA") due to the fact that many of the obese customers may have had actual

5  and/or perceived underlying psychological disorders resulting in obesity, which would be protected by the

6  ADA.  These statements by Lara Thom were ratified by MARKS. Despite these negative statements by

7  Ms. Thom, the Schaumberg opening, piloted by the NALT, broke records for first day sales and revenues

8  for any GYG location worldwide.

9      101.  Defendant MARKS offered Plaintiff TIM CREED, the only one of Plaintiffs who was

10  under the age of 40, to become the managing director of the NALT, and told him that he would be able to

11  work remotely from his home in Tennessee. However, Defendant MARKS later reneged and told Plaintiff

12  TIM CREED that he would be required to move to the Chicago-area if he wanted to continue working for

13  Defendant GYG US, even though Plaintiff TIM CREED always made clear to Defendant MARKS that

14  his life was in Tennessee and he would not be able to move, but would be able to successfully conduct his

15  work from Tennessee, especially because Defendant GYG US was supposed to be expanding into other

16  markets nationwide.  The promise to permit him to work from Tennessee was a material inducement to

17  TIM CREED accepting employment with GYG US and abandoning his other business endeavors.

18      102.  On or about February 16, 2023, Defendant GYG US, by and through Defendant MARKS,

19  terminated Plaintiffs FULMER and DE FERRANTE without cause and illegally due to their age.

20      103.  Defendant GYG US never hired Plaintiff GREG CREED as an employee, despite

21  previously agreeing to do so.

22      104.  MARKS ultimately admitted that the entire story behind the history of GYG's brand and

23  logo was completely fabricated and false. He never met his partner in New York; the names and images

24  used were not based on his purported Mexican friends as a young child who inspired his love of Mexican

25  cuisine; he never ate dinner at the home of a Mexican family; the images used by GYG US were simply

26  drawings created to culturally appropriate Mexican cuisine solely for a marketing benefit in Australia; and

27  even the names "Guzman" and "Gomez" were completely fabricated for marketing benefit.

28

105.    MARKS made false and misleading statements under penalty of perjury in numerous TRADEMARK FILINGS to the United States government further evidencing his maligned intent and complete disregard to United States laws and regulations.

106.    Plaintiffs are further informed and believe that the Board of Directors of GYG AUS was aware of MARKS's unstable, illegal and deceptive nature, as MARKS was following a secret, discrete plan involving cult-like life coaches and non-legal advisors to try to transition him to a credible, reliable executive to lead a $5 billion enterprise. Plaintiffs did not discover this information until after they were induced to enter into the transactions described herein with GYG AUS and MARKS.

**Defendants Omitted Material Facts and Risks Prior to Investment and Offer of Securities**

107.    Defendants failed to disclose numerous material facts in violation of a duty to disclose, or omitted such facts when disclosure was necessary to make prior statements made by Defendants not misleading, including those in the following paragraphs.

108.    Defendants failed to inform Plaintiffs that MARKS was deceptive, prone to sporadic and erratic behavior, with a history of discriminatory nature towards older people.

109.    Defendants failed to inform Plaintiffs that GYG AUS may choose to disregard the NALT Business Plan, including fail to follow and abide with each of the SIX POINTS that GYG AUS agreed to follow in pursuing the USA market.  It never occurred or was made known to Plaintiffs that GYG AUS would do that.

110.    Defendants failed to inform Plaintiffs and withheld that GYG AUS may not hire GREG CREED in March 2023. It never occurred to the Plaintiffs that GYG AUS would do that.

111.    Defendants failed to pursue fast causal locations since GYG AUS instead required drive thrus, which necessarily changed the type of business from 'fast casual' to 'fast food.' Operating as fast food made the locations less franchise friendly, with negative impacts on profit and loss metrics due to varying design costs and other factors.  Defendants even continue to misidentify the Crystal Lake location as fast casual, though industry experts would properly refer to it as a fast-food location. These actions further confuse sophisticated and experienced franchisees and demonstrate the incompetence of GYG AUS's Board and leadership in how they are approaching the USA market.

112.    Defendants failed to inform Plaintiffs that they could "change their mind" with everything they promised to do with respect to the USA market outlined in the NALT Business Plan and the SIX POINTS.

113.    Defendants failed to inform Plaintiffs of the material risks and facts concerning the decision to leave CREED UNCO and join GYG AUS for purposes of pursuing increasing the value of AUS SECURITIES, the PARTICIPATION SECURITIES and the INCENTIVE SECURITIES.

114.    Defendants failed to inform Plaintiffs that it may not permit Plaintiffs to run the USA business to achieve success in the USA in accordance with the NALT Business Plan.

115.    Defendants failed to adequately inform Plaintiffs that GYG AUS may refuse to follow the direction of the NALT team members to run the USA expansion.

116.    Defendants failed to inform Plaintiffs that it would reverse course and permit its executives and employees to reverse, change, undermine and fail to support the course contemplated by the NALT Business Plan and/or with respect to each of the SIX POINTS that had affirmatively been agreed upon by GYG AUS and was, in large part, the basis upon which the Plaintiffs agreed to the actions as hereinabove alleged.

117.    Defendants failed to inform Plaintiffs that it would not (and never intended to) invest at least USA$30 million to support Plaintiffs in the USA efforts to pursue the NALT Business Plan.

118.    Defendants failed to inform Plaintiffs that GYG AUS would require locations to have two drive-thrus to secure a location, despite previously representing that they would accept locations without drive-thru access.

119.    Defendants failed to inform Plaintiffs that GREG CREED would not be part of the overall business growth of GYG AUS or that GREG CREED would not be appointed or elected to the Board of Directors of GYG AUS, and Plaintiffs would not have invested in the AUS SECURITIES, accepted employment, abandoned Creed Unco or accepted the INCENTIVE SECURITIES in lieu of other compensation if they would have known GREG CREED would not actively participate in the US business or the Board of Directors of the global company.

120.    Defendants failed to inform Plaintiff that Marks was incompetent, unreliable, unstable, lied often, and changed course of actions arbitrarily.

121.    Defendants failed to inform Plaintiffs that the Board of Directors of GYG AUS permitted Marks to run the company without controls and policies in place to assure compliance with Board of Director decisions.

122.    Defendants failed to inform Plaintiffs that the Board of Directors of GYG AUS may change its mind.

123.    Defendants failed to inform Plaintiffs that Plaintiffs would not be able to liquidate their investments in AUS SECURITIES upon request.

124.    Defendant failed to provide a list of all material facts and risks with respect to AUS SECURITIES.

125.    Defendants failed to provide a list of all material facts and risks with respect to PARTICIPATION SECURITIES.

126.    Defendants failed to provide a list of all material facts and risks with respect to the INCENTIVE SECURITIES.

127.    Defendants failed to inform Plaintiff of complexities of Australia and USA law in offering of the AUS SECURITIES.

128.    Defendant failed to file any securities exemption filing for the offer of AUS SECURTIES in the United States, California, Ohio, Tennessee, or Texas.

129.    Defendants failed to file any securities exemptions for the offer of PARTICIPATION SECURITIES in the United States, California, Ohio, Tennessee, or Texas

130.    Defendants failed to file any securities exemptions for the offer of INCENTIVE SECURITIES in the United States, California, Ohio, Tennessee, or Texas.

131.    Plaintiffs would not have invested if they knew of any of the material omissions.

132.    Plaintiffs invested with the reasonable belief that GYG AUS would pursue the NALT Business Plan in the USA.

133.    Defendants abandoned the NALT Business Plan without the consent of Plaintiffs.

134.    Defendants failed to invest USA$30 million in the United States under direction of the employed NALT members.

///

**Defendants and Plaintiffs Formed a Joint Undertaking for Profit**

135.    Even though written agreements for employment were executed, they did not embody the entire relationship with the Plaintiffs and Defendants.

136.    Plaintiffs set aside CREED UNCO to pursue the joint undertaking of profiting from expansion of GYG locations within the United States through a joint venture. ("USA Joint Venture").

137.    The USA Joint Venture was structured so that marketing and developed would be handled by NALT Team.

138.    GYG AUS adopted this unwritten joint venture by informing in writing shareholders and investors about GREG CREED "joining" GYG AUS to develop the USA market.

139.    A fiduciary duty of loyalty and care was created and imposed by law as a result of the USA Joint Venture, and Plaintiffs are informed and believe and thereupon allege that GYG AUS, MARKS, RUSSO and other individuals and advisors actively engaged in intentional, grossly negligent and negligent actions that harmed and destroyed the USA Joint Venture.

140.    GYG AUS breached the fiduciary duties of loyalty and care created as a result of the USA Joint Venture.

**Defendants Misappropriated Greg Creed's Name and Likeness**

141.    Even though GREG CREED did not personally invest in the AUS SECURITIES and even though GREG CREED never became an employee or director of GYG AUS, Defendants, including MARKS, COWAN and RUSSO, used GREG CREED's name, likeness and celebrity status as the former CEO of YUM! to promote GREG CREED's involvement with GYG AUS to enhance GYG's brand worldwide and within the USA and to bolster and increase the stock value of GYG AUS.

142.    GREG CREED received no consideration for such misuse and misappropriation of his name and likeness by Defendants, including MARKS, COWAN and RUSSO.

143.    GREG CREED did not consent for any such use of his name and likeness.

144.    GREG CREED was misled and informed that he would receive the PARTICIPATION SECURITIES and that the employed NALT members would be provided access to USA$30 million to implement and pursue the NALT Business Plan and the business goals contemplated by the SIX POINTS.

145.   GREG CREED has received more than $100 million in stock benefits from other companies, such as YUM!, and the reputation and brand of his name and likeness has significant value.

146.   GREG CREED suffered harm and damage from their misappropriation of his name and likeness, harming his name and likeness.

147.   GREG CREED seeks comparable compensation and consideration, including issuance of his portion of the vested PARTICIPATION SECURITIES and the remaining unvested PARTICPATION SECURITIES.

148.   GREG CREED seeks USA$100 million in compensation for use of his name and likeness.

## FIRST CAUSE OF ACTION

### Fraud – Intentional Misrepresentation

### (By Plaintiffs Against All Defendants)

149.   Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein, and further alleges:

150.   As an inducement to cause Plaintiffs to enter into the agreements detailed herein, and abandon their business opportunities under Creed Unco, Defendants knowingly, falsely, fraudulently and intentionally misrepresented to, and omitted from, Plaintiffs the facts detailed above.  In the case of omissions, Defendants violated a duty to disclose, or the information omitted required disclosure to make prior statements by Defendants not misleading.  Such misrepresentations and omissions include but are not limited to:

   a.   Defendants failed to inform Plaintiffs that Marks was deceptive, prone to sporadic and erratic behavior, with a history of discriminatory nature towards older people.

   b.   Defendants failed to inform Plaintiffs that GYG AUS may choose to disregard the NALT Business Plan, including fail to follow and abide with each of the SIX POINTS that GYG AUS agreed to follow in pursuing the USA market.  It never occurred or was made known to Plaintiffs that GYG AUS would do that.

   c.   Defendants failed to inform Plaintiffs and withheld that GYG AUS may not hire GREG CREED in March 2023. It never occurred to the Plaintiffs that GYG AUS would do that.

   d.   Defendants failed to pursue fast causal locations since GYG AUS instead required drive

thrus, which necessarily changes the type of business from 'fast casual' to 'fast food.'
Operating as fast food made the locations less franchise friendly, with negative impacts on
profit and loss metrics due to varying design costs and other factors.  Defendants even
continue to misidentify the Crystal Lake location as fast casual (see attached press release),
though industry experts would properly refer to it as a fast-food location. These actions
further confuse sophisticated and experienced franchisees and demonstrate the
incompetence of GYG AUS's Board and leadership in how they are approaching the USA
market.

e.  Defendants failed to inform Plaintiffs that they could "change their mind" with everything
they promised to do with respect to the USA market outlined in the NALT Business Plan
and the Six Points.

f.  Defendants failed to inform Plaintiffs of the material risks and facts concerning the decision
to leave CREED UNCO and join GYG AUS for purposes of pursuing increasing the value
of AUS SECURITIES and the INCENTIVE SECURITIES.

g.  Defendants failed to inform Plaintiffs that it may not permit Plaintiffs to run the USA
business to achieve success in the USA in accordance with the NALT Business Plan.

h.  Defendants failed to adequately inform Plaintiffs that GYG AUS may refuse to follow the
direction of the employed NALT members to run the USA expansion.

i.  Defendants failed to inform Plaintiffs that it would reverse course and permit its executives
and employees to reverse, change, undermine and fail to support the course contemplated
by the NALT Business Plan and/or with respect to each of the SIX POINTS.

j.  Defendants failed to inform Plaintiffs that it would not invest at least USA$30 million to
support Plaintiffs in the USA efforts to pursue the NALT Business Plan.

k.  Defendants failed to inform Plaintiffs that GYG AUS would require locations to have two
drive-thrus to secure a location, despite previously representing that they would accept
locations without drive-thru access.

l.  Defendants failed to inform Plaintiffs that GREG CREED would not be part of the overall
business growth of GYG AUS or that GREG CREED would not be appointed or elected

to the Board of GYG, and Plaintiffs would not have invested in the AUS SECURITIES, accepted employment, abandoned Creed Unco or accepted the INCENTIVE SECURITIES if they would have known GREG CREED would not actively participate in the US business or the Board of global company.

m. Defendants misled Plaintiffs when presenting the INCENTIVE SECURITIES in light of the PARTICIPATION SECURITIES already agreed upon.

n. Defendants failed to honor and document the PARTICIPATION SECURITIES immediately entitling the employed Plaintiffs to 5% of all USA growth indefinitely and perpetually.

o. Defendants failed to inform Plaintiff that Marks was incompetent, unreliable, unstable, lied often, changed course of actions arbitrarily and engaged in illegal and unethical conduct.

p. Defendants failed to inform Plaintiffs that the Board permitted Marks to run the company without controls and policies in place to assure compliance with Board decisions.

q. Defendants failed to inform Plaintiffs that the Board may change its mind.

r. Defendants failed to inform Plaintiffs that Plaintiffs would not be able to liquidate its investment in AUS SECURITIES upon request.

s. Defendants failed to provide a list of all material facts and risks with respect to PARTICIPATION SECURITIES.

t. Defendants failed to provide a list of all material facts and risks with respect to INCENTIVE SECURITIES.

u. Defendant failed to provide a list of all material facts and risks with respect to AUS SECURITIES.

v. Defendants failed to inform Plaintiff of complexities of Australia and USA law in offering of the AUS SECURITIES.

w. Defendants represented to Plaintiffs that the AUS SECURITIES would be validly issued, but failed to file any securities exemption filing for the offer of AUS SECURITIES in the United States, California, Ohio, Tennessee, or Texas.

x. Defendants represented to Plaintiffs that the PARTICIPATION SECURITIES would be

32
COMPLAINT

validly issued, but failed to file any securities exemptions for the offer of PARTICIPATION SECURITIES in the United States, California, Ohio, Tennessee, or Texas.

y. Defendants represented to Plaintiffs that the INCENTIVE SECURITIES would be validly issued, but failed to file any securities exemptions for the offer of INCENTIVE SECURITIES in the United States.

z. Defendants represented to Plaintiffs that those employed Plaintiffs taking a reduced compensation would be provided something of value in lieu of standard compensation.

151. Defendants knew that their representations were false when they made them, or made the representations recklessly and without regard for the truth.

152. Defendants made the representations described herein, with the intent to induce Plaintiffs to rely on them.

153. Plaintiffs reasonably and justifiably relied on Defendants' representations to their detriment and injury as set forth herein. Plaintiffs did so because Defendants made those assertions and or omissions of material information. Plaintiffs had no reason to suspect that Defendants' representations were false or misleading.

154. As a direct, substantial and proximate result of the aforementioned acts of Defendants, Plaintiffs have sustained damages, the exact nature and full extent of which has yet to be ascertained, but which are in excess of the jurisdictional minimum of this Court.

155. In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice, which warrants Plaintiffs to be granted punitive or exemplary damages in an amount sufficient to punish Defendants and to deter such a conduct in the future.

## SECOND CAUSE OF ACTION

### Fraud – Negligent Misrepresentation

### (By Plaintiffs against all Defendants)

156. Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein, and further alleges:

157. As an inducement to cause Plaintiffs to enter into the agreements detailed herein, and

abandon their business opportunities under Creed Unco, Defendants negligently made the following misrepresentations to Plaintiffs of acts (or omitted facts) detailed above. In the case of omissions, Defendants violated a duty to disclose, or the information omitted required disclosure to make prior statements by Defendants not misleading.  Such misrepresentations and omissions include but are not limited to: \Defendants failed to inform Plaintiffs that Marks was deceptive, prone to sporadic and erratic behavior, with a history of discriminatory nature towards older people.

    a.  Defendants failed to inform Plaintiffs that GYG AUS may choose to disregard the NALT Business Plan, including fail to follow and abide with each of the SIX POINTS that GYG AUS agreed to follow in pursuing the USA market.  It never occurred or was made known to Plaintiffs that GYG AUS would do that.

    b.  Defendants failed to inform Plaintiffs and withheld that GYG AUS may not hire GREG CREED in March 2023. It never occurred to the Plaintiffs that GYG AUS would do that.

    c.  Defendants failed to pursue fast causal locations since GYG AUS instead required drive thrus, which necessarily changes the type of business from 'fast casual' to 'fast food.' Operating as fast food made the locations less franchise friendly, with negative impacts on profit and loss metrics due to varying design costs and other factors.  Defendants even continue to misidentify the Crystal Lake location as fast casual (see attached press release), though industry experts would properly refer to it as a fast-food location. These actions further confuse sophisticated and experienced franchisees and demonstrate the incompetence of GYG AUS's Board and leadership in how they are approaching the USA market.

    d.  Defendants failed to inform Plaintiffs that they could "change their mind" with everything they promised to do with respect to the USA market outlined in the NALT Business Plan and the Six Points.

    e.  Defendants failed to inform Plaintiffs of the material risks and facts concerning the decision to leave CREED UNCO and join GYG AUS for purposes of pursuing increasing the value of AUS SECURITIES and the INCENTIVE SECURITIES.

    f.  Defendants failed to inform Plaintiffs that it may not permit Plaintiffs to run the USA

1        business to achieve success in the USA in accordance with the NALT Business Plan.

2        g.  Defendants failed to adequately inform Plaintiffs that GYG AUS may refuse to follow the

3             direction of the employed NALT members to run the USA expansion.

4        h.  Defendants failed to inform Plaintiffs that it would reverse course and permit its executives

5             and employees to reverse, change, undermine and fail to support the course contemplated

6             by the NALT Business Plan and/or with respect to each of the SIX POINTS.

7        i.  Defendants failed to inform Plaintiffs that it would not invest at least USA$30 million to

8             support Plaintiffs in the USA efforts to pursue the NALT Business Plan.

9        j.  Defendants failed to inform Plaintiffs that GYG AUS would require locations to have two

10            drive-thrus to secure a location, despite previously representing that they would accept

11            locations without drive-thru access.

12        k.  Defendants failed to inform Plaintiffs that GREG CREED would not be part of the overall

13            business growth of GYG AUS or that GREG CREED would not be appointed or elected

14            to the Board of GYG, and Plaintiffs would not have invested in the AUS SECURITIES,

15            accepted employment, abandoned Creed Unco or accepted the INCENTIVE SECURITIES

16            if they would have known GREG CREED would not actively participate in the US business

17            or the Board of global company.

18        l.  Defendants misled Plaintiffs when presenting the INCENTIVE SECURITIES in light of

19            the PARTICIPATION SECURITIES already agreed upon.

20        m.  Defendants failed to honor and document the PARTICIPATION SECURITIES

21            immediately entitling the employed Plaintiffs to 5% of all USA growth indefinitely and

22            perpetually.

23        n.  Defendants failed to inform Plaintiff that Marks was incompetent, unreliable, unstable, lied

24            often, changed course of actions arbitrarily and engaged in illegal and unethical conduct.

25        o.  Defendants failed to inform Plaintiffs that the Board permitted Marks to run the company

26            without controls and policies in place to assure compliance with Board decisions.

27        p.  Defendants failed to inform Plaintiffs that the Board may change its mind.

28        q.  Defendants failed to inform Plaintiffs that Plaintiffs would not be able to liquidate its

investment in AUS SECURITIES upon request.

r. Defendants failed to provide a list of all material facts and risks with respect to PARTICIPATION SECURITIES.

s. Defendants failed to provide a list of all material facts and risks with respect to INCENTIVE SECURITIES.

t. Defendant failed to provide a list of all material facts and risks with respect to AUS SECURITIES.

u. Defendants failed to inform Plaintiff of complexities of Australia and USA law in offering of the AUS SECURITIES.

v. Defendants represented to Plaintiffs that the AUS SECURITIES would be validly issued, but failed to file any securities exemption filing for the offer of AUS SECURITIES in the United States, California, Ohio, Tennessee, or Texas.

w. Defendants represented to Plaintiffs that the PARTICIPATION SECURITIES would be validly issued, but failed to file any securities exemptions for the offer of PARTICIPATION SECURITIES in the United States, California, Ohio, Tennessee, or Texas.

x. Defendants represented to Plaintiffs that the INCENTIVE SECURITIES would be validly issued, but failed to file any securities exemptions for the offer of INCENTIVE SECURITIES in the United States.

y. Defendants represented to Plaintiffs that those employed Plaintiffs taking a reduced compensation would be provided something of value in lieu of standard compensation.

158.    Defendants knew that their representations were false when they made them, or made the representations negligently, recklessly and without regard for the truth.

159.    Defendants made the representations described herein, with the intent to induce Plaintiffs to rely on them.

160.    Plaintiffs reasonably and justifiably relied on Defendants' representations to their detriment and injury as set forth herein. Plaintiffs did so because Defendants made those assertions and or omissions of material information. Plaintiffs had no reason to suspect that Defendants' representations

1 | were false or misleading.

2 |     161.    As a direct, substantial and proximate result of the aforementioned acts of Defendants,
3 | Plaintiffs have sustained damages, the exact nature and full extent of which has yet to be ascertained, but
4 | which are in excess of the jurisdictional minimum of this Court.

5 |     162.    In doing the acts herein alleged, Defendants, and each of them, acted with oppression,
6 | fraud, and malice, which warrants Plaintiffs to be granted punitive or exemplary damages in an amount
7 | sufficient to punish Defendants and to deter such a conduct in the future.

8 | **THIRD CAUSE OF ACTION**

9 | **Breach of Contract**

10 | **(By Plaintiffs Against All Defendants)**

11 | **Count One**

12 |     163.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this
13 | Complaint as though fully set forth herein, and further alleges:

14 |     164.    In order to induce Plaintiffs to enter into the transactions described herein with Defendants,
15 | Defendants promised to Plaintiffs that Defendants would abide by the agreed upon plan and terms for
16 | expansion of GYG US, and that Defendants would abide by the NALT Plan.

17 |     165.    Based upon these promises made by Defendants, Plaintiffs did agree to participate in a
18 | business relationship with Defendants whereby they would execute the NALT Plan with the support of
19 | Defendants; that Plaintiffs would accept employment with Defendants under reduced compensatory rates;
20 | that Plaintiffs would devote their time and attention exclusively to Defendants' business; and that
21 | Defendants would cease doing business as CREED UNCO in favor of doing business with Defendants.

22 |     166.    Plaintiffs have performed, or have been excused from performing, all obligations incurred
23 | to Defendants.

24 |     167.    Defendants breached their promises to Plaintiffs by doing the following, without limitation:
25 | failing to follow the NALT Plan and the SIX POINTS; failing to limit their business into the fast-casual
26 | model; failing to modify the brand and improve the brand essence for the USA Market; failing to hire
27 | GREG CREED as an employee and Board Member of GYG AUS; failing to deploy USA$30 million in
28 | the USA Market with the NALT and failing to permit the NALT to open at least five showcase locations

1    in two separate markets, so that Defendants could utilize and leverage Plaintiff's resources and goodwill

2    without proper compensation.

3         168.    Plaintiffs relied upon such promises and agreements of Defendants in agreeing to enter into

4    the business arrangement.

5         169.    Defendants never intended on complying with the promises and representations made to

6    Plaintiffs.

7         170.    As a direct and proximate result of the breach of contract by Defendants, Plaintiffs have

8    been damaged in an amount to be proven at trial, but believed to excess of the minimum jurisdictional

9    limits of this court.

10        **Count Two**

11        171.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this

12   Complaint as though fully set forth herein, and further alleges as follows.

13        172.    On or about June 2, 2021, Plaintiffs and Defendants entered into a written agreement

14   entitled "Non-Disclosure Agreement" (the "NDA"). A true and correct copy of the form of the NDA

15   which was signed is attached hereto as Exhibit "D."

16        173.    Plaintiffs have performed, or have been excused from performing, all obligations incurred

17   to Defendants under the terms of the NDA.

18        174.    Defendants breached their obligations under the written NDA by using GREG CREED's

19   name and likeness in the 2021 TDM Memorandum, and by making public statements about Plaintiffs, all

20   of which were restricted by the terms of the NDA.

21        175.    As a direct and proximate result of the breach of contract by Defendants, Plaintiffs have

22   been damaged in an amount to be proven at trial, but believed to excess of the minimum jurisdictional

23   limits of this court.

24        **Count Three**

25        176.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this

26   Complaint as though fully set forth herein, and further allege as follows.

27        177.    In order to induce Plaintiffs to enter into the transactions described herein with Defendants,

28   Defendants promised to Plaintiffs that Defendants would issue the PARTICIPATION SECURITIES to

Plaintiffs by way of a separate written agreement that conformed with the terms of the offer by Defendants and acceptance by Plaintiffs prior to a separate writing.

178.    Based upon these promises made by Defendants, Plaintiffs did agree to participate in a business relationship with Defendants whereby Plaintiffs would accept the PARTICIPATION SECURITIES under the terms provided; and that Defendants issue the PARTICIPATION SECURITIES under those same terms originally proposed.

179.    Plaintiffs have performed, or have been excused from performing, all obligations incurred to Defendants.

180.    Defendants breached their promises to Plaintiffs by failing to produce documents and agreements that conformed to the terms of the PARTICIPATION SECURITIES.

181.    Plaintiffs relied upon such promises and agreements of Defendants in agreeing to enter into the business arrangement.

182.    Defendants never intended on complying with the promises and representations made to Plaintiffs.

183.    As a direct and proximate result of the breach of contract by Defendants, Plaintiffs have been damaged in an amount to be proven at trial, but believed to excess of the minimum jurisdictional limits of this court.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (By Plaintiffs Against All Defendants)

184.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein, and further alleges:

185.    As a result of Plaintiffs' investment with Defendants by and through the AUS SECURITIES, the PARTICIPATION SECURITIES and/or the INCENTIVE SECURITIES, Defendants were put in a position of trust and confidence with Plaintiffs, and entrusted to be a responsible steward of Plaintiffs' investments and funds, which Defendant has control over.

186.    As a result of the USA Joint Venture, evidenced by agreements that existed outside of the written agreements (e.g., the agreement to hire GREG CREED in March 2023), GYG AUS and its officers

1  and directors owed a direct fiduciary duty of loyalty and care to the employed NALT members and to

2  GREG CREED.

3    187.    Defendant breached his fiduciary duty to Plaintiff by, without limitation, failing to comply

4  with the NALT Business Plan to ensure growth of the US market; failing to hire GREG CREED;

5  repeatedly changing their decisions about the direction of the business in the US market; allowing

6  MARKS to arbitrarily and capriciously make decisions, engage in illegal and unethical conduct, change

7  decisions and discriminate in a manner that was harmful to the business operations and direction and

8  terminate employment of the employed Plaintiffs (or constructively accomplish the same as applicable)

9  and attempt to terminate their rights under the PARTICIPATION SECURITIES and/or the INCENTIVE

10  SECURITIES without cause.

11    188.    As a direct and proximate result of said acts, omissions or conduct of Defendants, as herein

12  alleged, Plaintiffs have sustained and incurred injuries and damages (both general and special) and are

13  certain in the future to sustain and incur losses (both incidental and consequential) in an amount to be

14  proven at trial, but in excess of the statutory minimums of this Court, plus interest thereon at the maximum

15  legal rate.

16  ### FIFTH CAUSE OF ACTION

17  ### Intentional Interference with Prospective Economic Relations

18  ### (By Plaintiffs Against All Defendants)

19    189.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this

20  Complaint as though fully set forth herein, and further alleges:

21    190.    Defendants, and each of them, were aware that Plaintiffs had an existing, and/or a

22  prospective economic relationship with third parties whereby Plaintiffs would provide such third parties

23  consulting services, and those third parties would provide monetary compensation, or other economic

24  benefit to Plaintiffs.

25    191.    Defendants knew of the relationship between Plaintiffs and these third parties, and knew

26  that Plaintiffs were seeking an economic benefit from such third parties. Defendants further knew that

27  their actions in requiring the exclusive services of Plaintiffs towards Defendants' business would cause

28  harm and disruption to Plaintiffs' other business opportunities.

192.    However, in order to induce Plaintiffs to enter into an exclusive economic relationship with Defendants, and therefore cease pursuing these other existing economic opportunities, Defendants, and each of them, made several false, misleading and deceptive statements and omissions as detailed herein. Plaintiffs would not have set aside these economic pursuits but for any and each of the false, misleading and deceptive statements and omissions.

193.    Plaintiffs were harmed by Defendants' actions, by cancelling existing business opportunities due to Defendants' actions, and other sustained economic losses attributable to Defendants' actions.

194.    As a direct, substantial and proximate result of the aforementioned acts of Defendants, Plaintiffs have sustained damages, the exact nature and full extent of which has yet to be ascertained, but which are in excess of the jurisdictional minimum of this Court.

<strong><u>SIXTH CAUSE OF ACTION</u></strong>

<strong><u>Securities Fraud</u></strong>

<strong><u>(By Plaintiffs Against All Defendants)</u></strong>

**<u>Count One – PARTICIPATION SECURITIES</u>**

195.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

196.    As an inducement to cause Plaintiffs to enter into the agreements with GYG US, Defendants made an offer of the PARTICIPATION SECURITIES to Plaintiffs. In doing so, Defendants knowingly, falsely, fraudulently and intentionally misrepresented to, or omitted from, Plaintiffs the facts detailed above. In the case of omissions, Defendants violated a duty to disclose, or the information omitted required disclosure to make prior statements by Defendants not misleading. Such misrepresentations and omissions include but are not limited to:

    a.  Defendants failed to inform Plaintiffs that Marks was deceptive, prone to sporadic and erratic behavior, with a history of discriminatory nature towards older people.

    b.  Defendants failed to inform Plaintiffs that GYG AUS may choose to disregard the NALT Business Plan, including fail to follow and abide with each of the SIX POINTS that GYG AUS agreed to follow in pursuing the USA market. It never occurred or was made known

41<br>COMPLAINT

1    to Plaintiffs that GYG AUS would do that.

2   c. Defendants failed to inform Plaintiffs and withheld that GYG AUS may not hire GREG

3     CREED in March 2023. It never occurred to the Plaintiffs that GYG AUS would do that.

4   d. Defendants failed to pursue fast causal locations since GYG AUS instead required drive

5     thrus, which necessarily changes the type of business from 'fast casual' to 'fast food.'

6     Operating as fast food made the locations less franchise friendly, with negative impacts on

7     profit and loss metrics due to varying design costs and other factors.  Defendants even

8     continue to misidentify the Crystal Lake location as fast casual (see attached press release),

9     though industry experts would properly refer to it as a fast-food location. These actions

10    further confuse sophisticated and experienced franchisees and demonstrate the

11     incompetence of GYG AUS's Board and leadership in how they are approaching the USA

12     market.

13   e. Defendants failed to inform Plaintiffs that they could "change their mind" with everything

14     they promised to do with respect to the USA market outlined in the NALT Business Plan

15     and the SIX POINTS.

16   f. Defendants failed to inform Plaintiffs of the material risks and facts concerning the decision

17     to leave CREED UNCO and join GYG AUS for purposes of pursuing increasing the value

18     of the PARTICIPATION SECURITIES.

19   g. Defendants failed to inform Plaintiffs that it may not permit Plaintiffs to run the USA

20     business to achieve success in the USA in accordance with the NALT Business Plan.

21   h. Defendants failed to adequately inform Plaintiffs that GYG AUS may refuse to follow the

22     direction of employed NALT members to run the USA expansion.

23   i. Defendants failed to inform Plaintiffs that it would reverse course and permit its executives

24     and employees to reverse, change, undermine and fail to support the course contemplated

25     by the NALT Business Plan and/or with respect to each of the SIX POINTS.

26   j. Defendants failed to inform Plaintiffs that it would not invest at least USA$30 million to

27     support Plaintiffs in the USA efforts to pursue the NALT Business Plan.

28   k. Defendants failed to inform Plaintiffs that GYG AUS would require locations to have two

drive-thrus to secure a location, despite previously representing that they would accept locations without drive-thru access.

l.  Defendants failed to inform Plaintiffs that GREG CREED would not be part of the overall business growth of GYG AUS or that GREG CREED would not be appointed or elected to the Board of Directors of GYG AU, and Plaintiffs would not have accepted employment, abandoned Creed Unco or accepted the PARTICIPATION SECURITIES in lieu of other compensation, if they would have known GREG CREED would not actively participate in the US business or the Board of Directors of the global company.

m.  Defendants failed to inform Plaintiff that Marks was incompetent, unreliable, unstable, lied often, engaged in illegal and unethical conduct, and changed course of actions arbitrarily.

n.  Defendants failed to inform Plaintiffs that the Board of Directors of GYG AU permitted MARKS to run the company without controls and policies in place to assure compliance with Board of Director decisions and law.

o.  Defendants failed to inform Plaintiffs that the Board of Directors of GYG AUS may change its mind.

p.  Defendants failed to provide a list of all material facts and risks with respect to PARTICIPATION SECURITIES.

q.  Defendants failed to inform Plaintiff of complexities of Australia and USA law in offering of the PARTICIPATION SECURITIES.

r.  Defendant failed to provide a list of all material facts and risks with respect to AUS SECURITIES and how that may impact the PARTICIPATION SECURITIES.

s.  Defendants represented to Plaintiffs that the PARTICIPATION SECURITIES would be validly issued, but failed to file any securities exemptions for the offer of PARTICIPATION SECURITIES in the United States, California, Tennessee, Ohio and Texas.

t.  Defendants represented to Plaintiffs that the PARTICIPATION SECURITIES would be duly authorized and not conflict with any other agreements, but did not make the shareholder documents available until January 2022.

u. Defendant made misrepresentations about the PARTICIPATION SECURITIES in order to induce employed Plaintiffs to replace them with the INCENTIVE SECURITIES.

197. Defendants knew that their representations were false when they made them, or made the representations recklessly and without regard for the truth.

198. Plaintiffs made the representations described herein, with the intent to induce Plaintiffs to rely on them.

199. Plaintiffs reasonably and justifiably relied on Defendants' representations to their detriment and injury as set forth herein. Plaintiffs did so because Defendants made those assertions and or omissions of material information. Plaintiffs had no reason to suspect that Defendants' representations were false or misleading.

200. As a direct, substantial and proximate result of the aforementioned acts of Defendants, Plaintiffs have sustained damages, the exact nature and full extent of which has yet to be ascertained, but which are in excess of the jurisdictional minimum of this Court.

201. These actions of Defendants were made in violation of Rule 10b-5 under Section 10(b) of the Exchange Act, 17 CFR § 240.10b-5; Cal. Corp. Code §25400, et seq.; and Cal. Corp. Code §25500, et seq.

**Count Two – INCENTIVE SECURITIES**

202. Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

203. As an inducement to cause Plaintiffs to enter into the LTIP Offer, constituting an offer of the INCENTIVE SECURITIES, Defendants knowingly, falsely, fraudulently and intentionally misrepresented to, or omitted from, Plaintiffs the facts detailed above. In the case of omissions, Defendants violated a duty to disclose, or the information omitted required disclosure to make prior statements by Defendants not misleading.  Such misrepresentations and omissions include but are not limited to:

a. Defendants failed to inform Plaintiffs that Marks was deceptive, prone to sporadic and erratic behavior, with a history of discriminatory nature towards older people.

b. Defendants failed to inform Plaintiffs that GYG AUS may choose to disregard the NALT Business Plan, including fail to follow and abide with each of the SIX POINTS that GYG

AUS agreed to follow in pursuing the USA market. It never occurred or was made known to Plaintiffs that GYG AUS would do that.

c.  Defendants failed to inform Plaintiffs and withheld that GYG AUS may not hire GREG CREED in March 2023. It never occurred to the Plaintiffs that GYG AUS would do that.

d.  Defendants failed to pursue fast causal locations since GYG AUS instead required drive thrus, which necessarily changes the type of business from 'fast casual' to 'fast food.' Operating as fast food made the locations less franchise friendly, with negative impacts on profit and loss metrics due to varying design costs and other factors. Defendants even continue to misidentify the Crystal Lake location as fast casual (see attached press release), though industry experts would properly refer to it as a fast-food location. These actions further confuse sophisticated and experienced franchisees and demonstrate the incompetence of GYG AUS's Board and leadership in how they are approaching the USA market.

e.  Defendants failed to inform Plaintiffs that they could "change their mind" with everything they promised to do with respect to the USA market outlined in the NALT Business Plan and the SIX POINTS.

f.  Defendants failed to inform Plaintiffs of the material risks and facts concerning the decision to leave CREED UNCO and join GYG AUS for purposes of pursuing increasing the value of the INCENTIVE SECURITIES.

g.  Defendants failed to inform Plaintiffs that it may not permit Plaintiffs to run the USA business to achieve success in the USA in accordance with the NALT Business Plan.

h.  Defendants failed to adequately inform Plaintiffs that GYG AUS may refuse to follow the direction of Creed Unco team members to run the USA expansion.

i.  Defendants failed to inform Plaintiffs that it would reverse course and permit its executives and employees to reverse, change, undermine and fail to support the course contemplated by the NALT Business Plan and/or with respect to each of the SIX POINTS.

j.  Defendants failed to inform Plaintiffs that it would not invest at least USA$30 million to support Plaintiffs in the USA efforts to pursue the NALT Business Plan.

k.  Defendants failed to inform Plaintiffs that GYG AUS would require locations to have two drive-thrus to secure a location, despite previously representing that they would accept locations without drive-thru access.

l.  Defendants failed to inform Plaintiffs that GREG CREED would not be part of the overall business growth of GYG AUS or that GRED CREED would not be appointed or elected to the Board of Directors of GYG AUS, and Plaintiffs would not have accepted employment, abandoned Creed Unco  or accepted the INCENTIVE SECURITIES in lieu of other compensation, if they would have known GREG CREED would not actively participate in the US business or the Board of global company.

m.  Defendants failed to inform Plaintiff that Marks was incompetent, unreliable, unstable, lied often, changed course of actions arbitrarily.

n.  Defendants failed to inform Plaintiffs that the Board permitted Marks to run the company without controls and policies in place to assure compliance with Board decisions and law.

o.  Defendants failed to inform Plaintiffs that the Board of Directors of GYG AUS may change its mind.

p.  Defendants failed to provide a list of all material facts and risks with respect to INCENTIVE SECURITIES.

q.  Defendant failed to provide a list of all material facts and risks with respect to AUS SECURITIES and how that may impact the INCENTIVE SECURITIES.

r.  Defendants failed to inform Plaintiff of complexities of Australia and USA law in offering of the INCENTIVE SECURITIES.

s.  Defendants represented to Plaintiffs that the INCENTIVE SECURITIES would be validly issued failed to file any securities exemptions for the offer of INCENTIVE SECURITIES in the United States, California, Tennessee, Ohio and Texas.

t.  Defendants represented to Plaintiffs that the INCENTIVE SECURITIES would be duly authorized and not conflict with any other agreements, but did not make the shareholder documents available until January 2022.

u.  Defendant made misrepresentations about why the INCENTIVE SECURITIES should

1    replace the PARTICIPATION SECURITIES, by claiming that it was required due to tax

2    consequences to Plaintiffs.

3        204.    Defendants knew that their representations were false when they made them, or made the

4    representations recklessly and without regard for the truth.

5        205.    Plaintiffs made the representations described herein, with the intent to induce Plaintiffs to

6    rely on them.

7        206.    Plaintiffs reasonably and justifiably relied on Defendants' representations to their

8    detriment and injury as set forth herein. Plaintiffs did so because Defendants made those assertions and or

9    omissions of material information. Plaintiffs had no reason to suspect that Defendants' representations

10   were false or misleading.

11       207.    As a direct, substantial and proximate result of the aforementioned acts of Defendants,

12   Plaintiffs have sustained damages, the exact nature and full extent of which has yet to be ascertained, but

13   which are in excess of the jurisdictional minimum of this Court.

14       208.    These actions of Defendants were made in violation of Rule 10b-5 under Section 10(b) of

15   the Exchange Act, 17 CFR § 240.10b-5; Cal. Corp. Code §25400, et seq.; and Cal. Corp. Code §25500,

16   et seq.

17   **Count Three – AUS SECURITIES**

18       209.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this

19   Complaint as though fully set forth herein.

20       210.    As an inducement to cause Plaintiffs to indirectly purchase, through an LLC in which the

21   Plaintiffs are Members, the AUS SECURITIES, Defendants knowingly, falsely, fraudulently and

22   intentionally misrepresented to, or omitted from, Plaintiffs the facts detailed above. In the case of

23   omissions, Defendants violated a duty to disclose, or the information omitted required disclosure to make

24   prior statements by Defendants not misleading.  Such misrepresentations and omissions include but are

25   not limited to:

26       a.  Defendants failed to inform Plaintiffs that Marks was deceptive, prone to sporadic and

27           erratic behavior, with a history of discriminatory nature towards older people and engaged

28           in illegal and unethical conduct.

b.  Defendants failed to inform Plaintiffs that GYG AUS may choose to disregard the NALT Business Plan, including fail to follow and abide with each of the SIX POINTS that GYG AUS agreed to follow in pursuing the USA market.  It never occurred or was made known to Plaintiffs that GYG AUS would do that.

c.  Defendants failed to inform Plaintiffs and withheld that GYG AUS may not hire GREG CREED in March 2023. It never occurred to the Plaintiffs that GYG AUS would do that.

d.  Defendants failed to pursue fast causal locations since GYG AUS instead required drive thrus, which necessarily changes the type of business from 'fast casual' to 'fast food.' Operating as fast food made the locations less franchise friendly, with negative impacts on profit and loss metrics due to varying design costs and other factors.  Defendants even continue to misidentify the Crystal Lake location as fast casual (see attached press release), though industry experts would properly refer to it as a fast-food location. These actions further confuse sophisticated and experienced franchisees and demonstrate the incompetence of GYG AUS's Board and leadership in how they are approaching the USA market.

e.  Defendants failed to inform Plaintiffs that they could "change their mind" with everything they promised to do with respect to the USA market outlined in the NALT Business Plan and the SIX POINTS.

f.  Defendants failed to inform Plaintiffs of the material risks and facts concerning the decision to leave CREED UNCO and join GYG AUS for purposes of pursuing increasing the value of AUS SECURITIES.

g.  Defendants failed to inform Plaintiffs that it may not permit Plaintiffs to run the USA business to achieve success in the USA in accordance with the NALT Business Plan.

h.  Defendants failed to adequately inform Plaintiffs that GYG AUS may refuse to follow the direction of Creed Unco team members to run the USA expansion.

i.  Defendants failed to inform Plaintiffs that it would reverse course and permit its executives and employees to reverse, change, undermine and fail to support the course contemplated by the NALT Business Plan and/or with respect to each of the SIX POINTS.

j.   Defendants failed to inform Plaintiffs that it would not invest at least USA$30 million to support Plaintiffs in the USA efforts to pursue the NALT Business Plan.

k.   Defendants failed to inform Plaintiffs that GYG AUS would require locations to have two drive-thrus to secure a location, despite previously representing that they would accept locations without drive-thru access.

l.   Defendants failed to inform Plaintiffs that GREG CREED would not be part of the overall business growth of GYG AUS or that GREG CREED would not be appointed or elected to the Board of GYG, and Plaintiffs would not have invested in the AUS SECURITIES if they would have known GREG CREED would not actively participate in the US business or the Board of Directors of the global company.

m.   Defendants failed to inform Plaintiff that Marks was incompetent, unreliable, unstable, lied often, changed course of actions arbitrarily and engaged in illegal and unethical conduct.

n.   Defendants failed to inform Plaintiffs that the Board permitted MARKS to run the company without controls and policies in place to assure compliance with Board of Director decisions.

o.   Defendants failed to inform Plaintiffs that the Board of Directors of GYG AUS may change its mind.

p.   Defendants failed to inform Plaintiffs that Plaintiffs would not be able to liquidate its investment in AUS SECURITIES upon request.

q.   Defendant failed to provide a list of all material facts and risks with respect to AUS SECURITIES.

r.   Defendant failed to provide a list of all material facts and risks with respect to PARTICIPATION SECURITIES and how that may impact the investment in the AUS SECURITIES.

s.   Defendants failed to inform Plaintiff of complexities of Australia and USA law in offering of the AUS SECURITIES.

t.   Defendants represented to Plaintiffs that the AUS SECURITIES would be validly issued, but failed to file any securities exemption filing for the offer of AUS SECURITIES in the

1    United States, California, Ohio, Tennessee, or Texas.

2    u.  Defendants represented to Plaintiffs that the PARTICIPATION SECURITIES and
3        INCENTIVE SECURITIES would be duly authorized and not conflict with any other
4        agreements, but did not make the shareholder documents available until January of 2022.

5    211.  Defendants knew that their representations were false when they made them, or made the
6    representations recklessly and without regard for the truth.

7    212.  Plaintiffs made the representations described herein, with the intent to induce Plaintiffs to
8    rely on them.

9    213.  Plaintiffs reasonably and justifiably relied on Defendants' representations to their
10   detriment and injury as set forth herein. Plaintiffs did so because Defendants made those assertions and or
11   omissions of material information. Plaintiffs had no reason to suspect that Defendants' representations
12   were false or misleading.

13   214.  As a direct, substantial and proximate result of the aforementioned acts of Defendants,
14   Plaintiffs have sustained damages, the exact nature and full extent of which has yet to be ascertained, but
15   which are in excess of the jurisdictional minimum of this Court.

16   215.  These actions of Defendants were made in violation of Rule 10b-5 under Section 10(b) of
17   the Exchange Act, 17 CFR § 240.10b-5; Cal. Corp. Code §25400, et seq.; and Cal. Corp. Code §25500,
18   et seq.

19                              **SEVENTH CAUSE OF ACTION**
20                                   **Declaratory Relief**
21                             **(By Plaintiffs Against Defendants)**

22   216.  Plaintiffs incorporate each and every allegation in the preceding paragraphs of this
23   Complaint as though fully set forth herein.

24   217.  A dispute and actual controversy has arisen and now exists between Plaintiffs and
25   Defendants, and each of them, in that Plaintiffs contend that the actions and agreements detailed herein
26   constituted an offer by Defendants and acceptance by Plaintiffs of the PARTICIPATION SECURITIES
27   fully vested immediately upon offer, such that the Plaintiffs are the present owners of the
28   PARTICIPATION SECURITIES and therefore entitled to at least 5% of the value that is created in the

1  GYG US business; and Plaintiffs is informed and believes that Defendants contend that Plaintiffs are not

2  the present owners of the PARTICIPATION SECURITIES.

3       218.    Plaintiffs desire a judicial determination of the respective rights and duties of Plaintiffs and

4  Defendants, and each of them, with respect to the ownership of PARTICIPATION SECURITIES.

5       219.    Such a declaration is necessary and appropriate at this time so Plaintiffs may ascertain their

6  rights.

7                                  **EIGHTH CAUSE OF ACTION**

8                        **Wrongful Termination In Violation of Public Policy**

9     **(By Plaintiffs Fulmer, De Ferrante, Armbruster and Henry Against Defendant GYG US and GYG**

10                                            **AUS)**

11      220.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this

12  Complaint as though fully set forth herein.

13      221.    Plaintiffs FULMER, DE FERRANTE, ARMBRUSTER and HENRY were employees of

14  Defendant GYG US, and such employment was controlled by GYG AUS. At all times during their

15  employment, Plaintiffs performed their duties satisfactorily and, in fact, exceptionally well.

16      222.    Defendant wrongfully terminated Plaintiffs' employment in violation of fundamental

17  public policy underlying both state and federal law. Specifically, Defendant GYG US terminated

18  Plaintiff's employment in part because of their protected status (e.g., age; at all times during their

19  employment, Plaintiffs Fulmer, De Ferrante, Armbruster and Henry were over the age of 40.) This public

20  policy is embodied in FEHA (for California employees, such as Fulmer and DeFerrante), and the Age

21  Discrimination in Employment Act (ADEA).

22      223.    As a direct and proximate result of Defendant GYG US's conduct, Plaintiffs have sustained

23  and continue to sustain humiliation, emotional distress, embarrassment, damage to their reputations and

24  careers, pain and anguish, in an amount which exceeds the minimal jurisdictional requirements of this

25  Court. The exact amount of Plaintiffs' damages is currently not ascertained, but will be shown according

26  to proof at the time of trial.

27      224.    As a further direct and proximate result of Defendant GYG US's conduct, Plaintiffs

28  suffered loss of earnings and other employment benefits in an amount which exceeds the minimal

1  jurisdictional requirements of this Court. The exact amount of Plaintiffs' damages is currently not
2  ascertained, but will be shown according to proof at the time of trial.

3      225.    Defendant GYG US carried out the above-mentioned actions in a malicious, willful, and
4  oppressive manner with the intent to injure and damage Plaintiffs, entitling Plaintiffs to recover punitive
5  damages from Defendant GYG US. Defendant discriminated against Plaintiffs based on their ages with
6  the intent to injure Plaintiffs and with the intent to prevent the exercise of their statutory rights and
7  privileges. Defendant GYG US's officers, managerial and supervisory employees (including without
8  limitation Steven Marks) participated in the unlawful conduct as alleged above or had actual knowledge
9  that the conduct was unlawful and nevertheless authorized and/or ratified the practices with conscious
10  disregard for the rights and safety of Plaintiffs.

11      226.    Plaintiffs have incurred and continue to incur legal expenses and attorneys' fees. Plaintiff,
12  in an amount according to proof at trial.

13                        **NINTH CAUSE OF ACTION**
14                          **Age Discrimination**
15  **(By Plaintiffs Fulmer, De Ferrante, Armbruster and Henry Against Defendants GYG US and**
16                              **GYG AUS)**

17      227.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this
18  Complaint as though fully set forth herein.

19      228.    Plaintiffs Fulmer, De Ferrante, Armbruster and Henry were employees of Defendant GYG
20  US, and that such employment was controlled by GYG AUS. At all times during their employment,
21  Plaintiffs performed their duties satisfactorily and, in fact, exceptionally well. At all relevant times,
22  Plaintiffs were over 40 years old and, therefore, members of a protected class.

23      229.    At all times mentioned herein, California's Fair Employment and Housing Act (FEHA),
24  Government Code section 12940 *et seq.*, was in full force and effect and was binding on Defendant GYG
25  US. This statute requires Defendant GYG US to refrain from discriminating against any employee because
26  of their age. Within the time period provided by law, Plaintiffs Fulmer and De Ferrante filed complaints
27  with the Department of Fair Employment and Housing (DFEH), in full compliance with administrative
28  requirements, and received right-to-sue letters. Apart from mandated travel, Plaintiffs Fulmer and De

1  Ferrante conducted all of their employment obligations from and within the County of Orange, State of

2  California, including but not limited to telephone calls, videoconferences, emails, computer work and

3  general strategic analysis and evaluation of their obligations on behalf of GYG US.  In addition, at all

4  times mentioned herein, The Age Discrimination in Employment Act (ADEA) was in full force and effect

5  and was binding on Defendant GYG US.

6       230.    Notwithstanding the duties imposed on it by FEHA and The Age Discrimination in

7  Employment Act (ADEA), Defendant GYG US discriminated against Plaintiffs based upon their ages, as

8  described above, ultimately resulting in the termination of their employment. On the basis of the conduct

9  described above, Plaintiffs believe and allege that age was a substantial motivating reason in Defendant

10  GYG US's termination of their employment.

11       231.    The acts described herein were authorized and ratified by Defendant GYG US's officers,

12  managerial and supervisory employees (including without limitation Steven Marks) when they

13  participated in the above-mentioned discriminatory practices and./or ratified the conduct against Plaintiffs,

14  and when they failed to take preventative or remedial measures after learning of the discriminatory

15  practices.

16       232.    As a direct and proximate result of Defendant GYG US's conduct, Plaintiffs have sustained

17  and continue to sustain humiliation, emotional distress, embarrassment, damage to their reputations and

18  careers, pain and anguish, in an amount which exceeds the minimal jurisdictional requirements of this

19  Court. The exact amount of Plaintiffs' damages is currently not ascertained, but will be shown according

20  to proof at the time of trial.

21       233.    As a further direct and proximate result of Defendant GYG US's conduct, Plaintiffs

22  suffered loss of earnings and other employment benefits in an amount which exceeds the minimal

23  jurisdictional requirements of this Court. The exact amount of Plaintiffs' damages is currently not

24  ascertained, but will be shown according to proof at the time of trial.

25       234.    Defendant GYG US carried out the above-mentioned actions in a malicious, willful, and

26  oppressive manner with the intent to injure and damage Plaintiffs, entitling Plaintiffs to recover punitive

27  damages from Defendant GYG US. Defendant discriminated against Plaintiffs based on their ages with

28  the intent to injure Plaintiffs and with the intent to prevent the exercise of their statutory rights and

privileges. Defendant GYG US's officers, managerial and supervisory employees (including without limitation Steven Marks) participated in the unlawful conduct as alleged above or had actual knowledge that the conduct was unlawful and nevertheless authorized and/or ratified the practices with conscious disregard for the rights and safety of Plaintiffs.

235.    Plaintiff have incurred and continue to incur legal expenses and attorneys' fees. Plaintiff, in an amount according to proof at trial.

### TENTH CAUSE OF ACTION

### Failure to Remedy and/or to Prevent Discrimination

### (By Plaintiffs Fulmer, De Ferrante, Armbruster and Henry Against Defendants GYG US, GYG AUS)

236.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

237.    At all times mentioned herein, California's Fair Employment and Housing Act (FEHA), Government Code section 12940 *et seq.*, was in full force and effect and was binding on Defendant GYG US. This statute states that it is an unlawful employment practice in California for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Within the time period provided by law, Plaintiffs filed complaints with the Department of Fair Employment and Housing (DFEH), in full compliance with administrative requirements, and received right-to-sue letters.

238.    During the course of Plaintiff's employment, Defendant GYG US, under the control of Defendant GYG AUS, failed to take all reasonable steps to prevent its officers and employees (including without limitation Steven Marks) from engaging in a pattern and practice of intentional actions against Plaintiffs based on their ages. These intentional discriminatory actions culminated in Defendant terminating Plaintiffs' employment based, in part, on their ages.  Defendant also failed to remedy this discrimination.

239.    As a direct and proximate result of Defendant GYG US's conduct, Plaintiffs have sustained and continue to sustain humiliation, emotional distress, embarrassment, damage to their reputations and careers, pain and anguish, in an amount which exceeds the minimal jurisdictional requirements of this

1    Court. The exact amount of Plaintiffs' damages is currently not ascertained, but will be shown according
2    to proof at the time of trial.

3        240.    As a further direct and proximate result of Defendant GYG US's conduct, Plaintiffs
4    suffered loss of earnings and other employment benefits in an amount which exceeds the minimal
5    jurisdictional requirements of this Court. The exact amount of Plaintiffs' damages is currently not
6    ascertained, but will be shown according to proof at the time of trial.

7        241.    Defendant GYG US carried out the above-mentioned actions in a malicious, willful, and
8    oppressive manner with the intent to injure and damage Plaintiffs, entitling Plaintiffs to recover punitive
9    damages from Defendant GYG US. Defendant discriminated against Plaintiffs based on their ages with
10   the intent to injure Plaintiffs and with the intent to prevent the exercise of their statutory rights and
11   privileges. Defendant GYG US's officers, managerial and supervisory employees (including without
12   limitation Steven Marks) participated in the unlawful conduct as alleged above or had actual knowledge
13   that the conduct was unlawful and nevertheless authorized and/or ratified the practices with conscious
14   disregard for the rights and safety of Plaintiffs.

15       242.    Plaintiffs have incurred and continue to incur legal expenses and attorneys' fees. Plaintiff,
16   in an amount according to proof at trial.

17                          **ELEVENTH CAUSE OF ACTION**
18                    **Intentional Infliction of Emotional Distress**
19   **(By Plaintiffs Fulmer, De Ferrante, Armbruster and Henry Against Defendants GYG US, GYG**
20                                    **AUS)**

21       243.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this
22   Complaint as though fully set forth herein.

23       244.    Defendant GYG US's discriminatory actions against Plaintiffs constitute severe and
24   outrageous misconduct and caused Plaintiffs extreme emotional distress. Plaintiffs were employees of
25   Defendant GYG US, and such employment was controlled by GYG AUS.

26       245.    Defendant GYG US was aware that treating Plaintiff in the manner descried above,
27   including without limitation terminating their employment, would devastate Plaintiff and cause them
28   extreme hardship.

246.    Defendant GYG US was aware that treating Plaintiff in the manner descried above, including without limitation terminating their employment, would devastate Plaintiff and cause them extreme hardship.

247.    Defendant GYG US carried out the above-mentioned actions in a malicious, willful, and oppressive manner with the intent to injure and damage Plaintiffs, entitling Plaintiffs to recover punitive damages from Defendant GYG US.

## TWELFTH CAUSE OF ACTION

### Unfair Business Practices Under California B&P Code §17200 et seq.

### (By Plaintiffs Against Defendant GYG US)

248.    Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

249.    Defendants' actions, as described above (including without limitation, violation of FEHA) constitute unfair business practices in violation of California Business & Professions Code §§ 17200 *et seq.*

250.    As a result of Defendants' unfair business practices, Defendants have reaped unfair benefits and illegal profits at the expense of Plaintiffs and members of the public. Defendant should be made to disgorge their ill-gotten gains and restore such monies to Plaintiffs.

251.    Defendants' unfair business practices entitle Plaintiffs to seek preliminary and permanent injunctive relief, including but not limited to order that the Defendants account for, disgorge, and restore to Plaintiffs all monies and benefits unlawfully withheld from them.

## THIRTEENTH CAUSE OF ACTION

### WRONGFUL TERMINATION IN VIOLATION OF FEHA,

### GOVERNMENT CODE SECTION 12940 ET SEQ.

### (Plaintiffs Fulmer, DeFerrante against Defendants GYG US and GYG AUS, and DOES 1 through 10)

252.    Plaintiffs incorporate by this reference as though set forth in full the allegations of the preceding paragraphs of this Complaint.

253.  Plaintiffs were employees of Defendant GYG US, and such employment was controlled by GYG AUS. Plaintiffs believe and thereon alleges that their age was a factor in Defendant's wrongful termination of Plaintiffs, as stated above in the General Allegations and Summary of Facts, incorporated herein.

254.  At all times herein relevant, there was an employer/employee, agency, or other qualified relationship between Plaintiffs and Defendant. *California Government Code* § 12940 et seq.

255.  Plaintiffs' termination was wrongful because it was based on their individual age (over 40 years old) and in retaliation for reporting discrimination and harassment in violation of *California Government Code* § 12940 et. seq. and the administrative regulations of the Fair Employment and Housing Act.

256.  Defendant's conduct above described is in violation of various statues and the decisional law of this state and country, including but not limited to the FEHA, *California Government Code* § 12940 et. seq.; *Title VII Civil Rights Act of 1964*; *Scott v. Pacific Gas and Elec. Co.* (1995) 11 Cal. 4th 454, 464; *Stephens v. Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal. App. 3d 1394, 1399-1401; California Constitution Article I, Section 8.

257.  As a direct and proximate result of Defendant's unlawful conduct as alleged herein, Plaintiffs have suffered extreme and severe anguish, humiliation, anger, tension, anxiety, depression, lowered self-esteem, sleeplessness and severe emotional distress.

258.  As a further direct and proximate result of the unlawful conduct, Plaintiffs have suffered and continue to suffer loss of income, loss of stock benefits, loss of accretion in the value of AUS SECURITIES, loss of benefits to PARTICIPATION SECURITIES and INCENTIVE SECURITIES, loss of earning capacity, loss of job opportunity and other losses.

259.  Defendant's conduct described above was willful, despicable, knowing, and intentional; accordingly, Plaintiffs seek an award of punitive damages and exemplary damages in an amount according to proof.

260.  Plaintiffs also seeks attorneys' fees in an amount according to proof.

///
///

1

2

3

4

**FOURTEENTH CAUSE OF ACTION**

**RETALIATORY TERMINATION IN VIOLATION OF FEHA,**

**GOVERNMENT CODE SECTION 12940 ET SEQ.**

(**Plaintiffs Fulmer, DeFerrante, against Defendant GYG US, and DOES 1 through 10**)

5    261.    Plaintiffs incorporates by this reference as though set forth in full the allegations of

6    the preceding paragraphs of this Complaint.

7    262.    At all times herein relevant, there was an employer/employee, agency, or other qualified

8    relationship between Plaintiffs and Defendant. *California Government Code* § 12940 et seq. Plaintiffs

9    were employees of Defendant GYG US, and such employment was controlled by GYG AUS.

10    263.    Plaintiff's termination was wrongful because it was based on retaliation for reporting

11    discrimination and harassment in violation of *California Government Code* § 12940 et. seq. and the

12    administrative regulations of the Fair Employment and Housing Act.

13    264.    It is against the law to retaliate against an employee for making protected complaints of

14    discrimination and harassment pursuant to *California Government Code* § 12940 et. seq.

15    265.    Plaintiffs did in fact make protected complaints of discrimination, harassment, retaliation,

16    and disparate treatment towards each of them based on discrimination. Defendant knew about the

17    complaints.

18    266.    Plaintiffs' complaints of discrimination, harassment, and retaliation were a substantial

19    motivating factor in each of Plaintiffs' terminations.

20    267.    Defendant's conduct above described is in violation of various statues and the decisional

21    law of this state and country, including but not limited to the FEHA, *California Government Code* § 12940

22    et. seq.; *Title VII Civil Rights Act of 1964*; *Scott v. Pacific Gas and Elec. Co.* (1995) 11 Cal. 4th 454, 464;

23    *Stephens v. Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal. App. 3d 1394, 1399-1401;

24    California Constitution Article I, Section 8.

25    268.    As a direct and proximate result of Defendant's unlawful conduct as alleged herein,

26    Plaintiffs have suffered extreme and severe anguish, humiliation, anger, tension, anxiety, depression,

27    lowered self-esteem, sleeplessness and severe emotional distress.

28

1    269.    As a further direct and proximate result of the unlawful conduct, Plaintiffs have suffered

2    and continue to suffer loss of income, loss of income, loss of stock benefits, loss of accretion in the value

3    of AUS SECURITIES, loss of benefits to PARTICIPATION SECURITIES and INCENTIVE

4    SECURITIES, loss of earning capacity, loss of job opportunity and other losses.

5    270.    Defendant's conduct described above was willful, despicable, knowing, and intentional;

6    accordingly, Plaintiffs seek an award of punitive damages and exemplary damages in an amount according

7    to proof.

8    271.    Plaintiffs also seeks attorneys' fees in an amount according to proof.

9    **FIFTEENTH CAUSE OF ACTION**

10    **CONSTRUCTIVE DISCHARGE**

11    **(Plaintiff Armbruster against Defendant GYG US,**

12    **and DOES 1 through 10)**

13    272.    Plaintiff incorporates by this reference as though set forth in full the allegations of the

14    preceding paragraphs of this Complaint.

15    273.    Defendant GYG US (through its officers, directors, managing agents, or supervisory

16    employees and under the control of GYG AUS), intentionally created or knowingly permitted working

17    conditions to exist that were so intolerable that a reasonable person in Plaintiff's position would have no

18    reasonable alternative except to resign.

19    274.    Plaintiff resigned because of these working conditions.

20    275.    The age discrimination and preference given to younger employees and people working at

21    GYG US caused him to quit (i.e., be constructively discharged) on or about November 1, 2022.

22    276.    Plaintiff's constructive termination was wrongful because he was forced to quit in part

23    because of his age and age discrimination in violation of *California Government Code* §12940 et. seq.

24    277.    Defendant's conduct above described is in violation of various statues and the decisional

25    law of this state and country, including but not limited to The Age Discrimination in Employment Act

26    (ADEA).

27

28

278.   As a direct and proximate result of Defendant's unlawful conduct as alleged herein, Plaintiff has suffered extreme and severe anguish, humiliation, anger, tension, anxiety, depression, lowered self-esteem, sleeplessness and severe emotional distress.

279.   As a further direct and proximate result of the unlawful conduct, Plaintiff has suffered and continues to suffer loss of income, loss of earning capacity, loss of job opportunity and other losses.

280.   Defendant's conduct described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks and award of punitive damages and exemplary damages in an amount according to proof.

281.   Plaintiff also seeks attorneys' fees in an amount according to proof.

## SIXTEENTH CAUSE OF ACTION

## MISAPPROPRIATION OF NAME AND LIKENESS OF GREG CREED

## (By Plaintiffs against Defendants GYG AUS, GYG US,

## and DOES 1 through 10)

282.   Plaintiff incorporates by this reference as though set forth in full the allegations of the preceding paragraphs of this Complaint.

283.   The 2021 TDM Memorandum misappropriated and created a false affiliation with GREG CREED that was used to increase enterprise value of GYG AUS and GYG US.

284.   CREED UNCO and other Plaintiffs were all entitled to any benefit arising from use of GREG CREED's name and likeness, and all his rights of publicity in connection with affiliating with GYG AUS and GYG US was to be shared on a predetermined allocation of percentages that were similar to those assigned to the PARTICIPATION SECURITIES and INCENTIVE SECURITIES.

285.   The measure of value provided to the enterprise for the misleading affiliation can be measured by a curiously timed stock transaction whereby Magellan profited in the amount of approximately AUD$34 million.

286.   The Defendants did not have consent or permission to use GREG CREED's name in the 2021 TDM Memorandum or in discussions and meetings that took place with investors on or about that time the memorandum was communicated to the Board of Directors of GYG AUS and current and prospective investors.

287. The Defendants never compensated or paid any of the Plaintiffs any amounts for use of GREG CREED's name and publicity rights in the 2021 TDM Memorandum and contemporaneously communications and meetings.

288. Defendants knew of and admitted knowing of the value of GREG CREED's rights to publicity when MARKS said not to use GREG CREED's name until "the time was right", indicating that GYG AUS knew that the CREED brand would attract corporate franchisees and investors that would lead to the quick expansion contemplated by the NALT Plan and the SIX POINTS.

289. As a further direct and proximate result of misappropriation and false affiliation of GREG CREED's name in the 2021 TDM Memorandum and other correspondences, the 'CREED' brand has suffered harm and continues to suffer harm and damage, harming and damaging GREG CREED's right to publicity.

290. As a further direct and proximate result of the unlawful conduct, CREED UNCO's has lost value arising from GREG CREED's name and likeness and otherwise arising from his rights of publicity that were intended solely for use by CREED UNCO.

291. As a further direct and proximate result, each of the individual Plaintiffs had ownership rights in CREED UNCO and accordingly each has suffered from the non-consensual use of GREG CREED's name and likeness.

292. Each of the Plaintiffs has suffered and continues to suffer loss of income, loss of earning capacity, loss of job opportunity and other losses.

293. Defendant's conduct described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks and award of punitive damages and exemplary damages in an amount according to proof.

294. Plaintiffs seek disgorgement of any profits made from use of GREG CREED's name and likeness.

295. Plaintiffs also seek attorneys' fees in an amount according to proof.

296. Plaintiffs also seek an injunction to be issued by this court to cease the wrongful misappropriation of GREG CREED's name and likeness by Defendants.

///

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment as set forth below:

1. For general damages according to proof;

2. For compensatory damages according to proof;

3. For special damages according to proof;

4. For punitive and exemplary damages in an amount sufficient to punish Defendants and deter other wrongdoers from engaging in such misconduct;

5. For statutory damages in the amount provided by statute for Defendants' violation of applicable securities laws.

6. For injunctive relief barring Defendants' discriminatory employment policies and practices in the future;

7. For injunctive relief barring Defendants from engaging in any retaliatory actions with respect to the AUS SECURITIES purchased indirectly by Plaintiffs;

8. For injunctive relief to cease the wrongful misappropriation of GREG CREED's name and likeness by Defendants;

9. For restitutionary disgorgement of profits garnered as a result of Defendants' unlawful conduct;

10. For a declaration 50% of the PARTICIPATION SECURITIES are fully vested and remain outstanding in perpetual basis for the Plaintiffs to enjoy at their discretion until such time that such persons elect to convert such PARTICIPATION SECURITIES into AUS SECURITIES.

11. For reasonable attorneys' fees;

12. For cost of suit herein including pre-judgment interest; and

13. For any such other and further relief the Court deems just and proper.

Dated: June 29, 2023

BOHM WILDISH & MATSEN, LLP

By: _____

James G. Bohm, Esq.
Attorneys for Plaintiffs

1

## DEMAND FOR JURY TRIAL

2      Plaintiffs CREED UNCO, LLC; GREG CREED; ROBERT A. FULMER; EDWIN DE

3  FERRANTE; CHRIS ARMBRUSTER; JENNIFER HENRY, hereby demand a trial by jury.

4

5  Dated: June 29, 2023                          BOHM WILDISH & MATSEN, LLP

6

                                     By:        _____
7
                                                James G. Bohm, Esq.
8                                               Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Sent from my iPad

Begin forwarded message:

> **From:** Tom Cowan <tomc@tdmgrowth.com>
> **Date:** September 1, 2021 at 5:11:14 AM CDT
> **To:** Greg Creed <greg@creedunco.com>
> **Cc:** "Steven Marks (steven@gyg.com.au)" <steven@gyg.com.au>, Tom Cowan <tomc@tdmgrowth.com>
> **Subject: Tomorrow**

Hi Greg

Thanks for the presentation – it was good for a number of us to better understand your plan of attack from here.

We thought it would be worthwhile sending you some thoughts before the meeting.

There we a few topics we were keen to align on:

Potential Yum deal

We are open to a Yum deal but we think you should know some things we wouldn't accept:

- An option for Yum to acquire GYG in the future. We are open to them investing in GYG but any future acquisition would be a negotiation at the time
- Yum being involved in the running of GYG US – we agree there is value in leveraging their expertise eg supply chain, property and franchisees

Staging the US roll out

We are all very excited about the opportunity in the US and think with time we will prove to be successful. We all have signed on to the prospect of getting to 150 stores in 5 years and 500 stores in 10 years.

Having said that, we are also very focused on making sure the first 15 stores are successful which will set the platform for the rest. As we get data from new restaurants we will adjust. We are committing to a minimum of 15 restaurants in 2 to 3 years. If the stores are hitting the targets, then we would make sure we are in position to:

- Accelerate if possible
- Make sure we are setting the business up for the 5 – 6 year plan of 150 stores and beyond.

We think we agree – but to confirm the approach:

- Identify one or two markets  where at least 5 or 10 stores are opened by a franchisee in next 2-3 years – there could be more if data is positive
- Chicago – GYG US to open at least more 4 corporate restaurants ( total 5 corporate stores ) in the next 12-18 months – there could be more if data is positive

2

**Remuneration**

We would like Unco to be the GYG management team and to commit for 3 years exclusively to GYG (with a 6 months notice period)

We acknowledge the remuneration proposal put forward.

GYG has an overall company remuneration philosophy that is based on a sharing of the success in the business through equity and less cash remuneration. We also believe in the benefits of strong alignment of equity ownership. Everyone on the Board has invested personally into GYG — including Guy Russo and Steve Jermyn when GYG only had 4 unprofitable stores in Sydney.

There are a number of different ways to achieve this for Unco but ultimately we would like to discuss less cash remuneration, higher equity participation and an investment of cash. We think it is very important to agree all components of remuneration at once and for Unco to have "skin in the game".

Based on discussions with Hamish Douglass — we were hoping to discuss the following alternative:

- US$250k per annum per person.
- 5% of the GYG US issued now but would vest equally at the end of year 2 and 3. Apart from time, there are no other hurdles.
- 2.5% of GYG US issued now but vesting at the end of year 4 subject to having at least [xx] number of stores and [$xx] revenue
- 2.5% of GYG US issued now but vesting at the end of year 5 subject to having at least [xx] number of stores and [$xx] revenue
- The ability for the team to buy up to 1% of GYG Holdings at Magellan's entry price

Look forward to discussing

Regards
Tom



**Tom Cowan**
M: +61 402 981 977
tdmgrowthpartners.com
Sydney | New York

 TDM's new podcast "Scaling Up" now on Spotify and Apple iTunes!

3

# EXHIBIT B



# FRAMEWORK FOR GYG US LEADERSHIP TEAM EQUITY PARTICIPATION

## November 2021

# Executive Summary
## INDICATIVE PROPOSAL AND PRINCIPAL MECHANICS

- As agreed, the North America Leadership Team ("NALT") remuneration will consist of a combination of cash and equity

- The equity component will be in the form of performance rights issued, which will convert into shares in GYG Holdings based on an agreed conversion mechanism

- The effect of the above is that NALT will receive shares in GYG Holdings based on sharing in 10% of the value that is created in the GYG US business

- The 10% of the value created will vest as follows:

  o  5% vesting equally at the end of years 2 and 3 with no hurdles apart from time

  o  2.5% vesting at the end of year 4 subject to achieving at least 45 stores and $70m network sales

  o  2.5% vesting at the end of year 5 subject to achieving at least 95 stores and $160m network sales

- This document outlines the proposed conversion mechanism based on *indicative* valuations of GYG US and GYG Holdings, as well as summarising the important tax considerations associated with this mechanism

- This proposal is based on alignment with the originally agreed time line, and the analysis assumes a 1 January 2022 initiation date

- Based on this analysis, NALT could be issued up to a total of c.7,600 shares in GYG Holdings over the 5 year period, representing a cumulative total value of c.US$60m before tax

- Additionally, the indicative value of NALT's initial investment in 1% of GYG Holdings (c.US$7m) at the end of the 5 year period is estimated to be c.US$30m, representing a net increase of US$23m or an annual return on investment of c.35%

2

# Equity Conversion Outline
### KEY STEPS AND SIMPLE EXAMPLE BASED ON EXAMPLE YEAR 5 CONVERSION

## KEY STEPS OF THE CONVERSION PROCESS



### Step 1: What is the value of GYG US?

a) Based on where key public comparable QSR businesses trade and GYG's relative whitespace potential and expected network sales growth, we believe a fair value for GYG US would be around 3.5x the last 12 months ("LTM") network sales

b) NALT's share of the value created in GYG US will then be calculated based on the % vested at that point in time



### Step 2: What is the value of GYG Holdings Equity?

- If GYG is public at the time of conversion, the value of GYG Holdings equity will be determined based on a 30-day volume weighted average price ("VWAP") for the stock in the public markets

- If GYG remains private at the time of conversion, the value of GYG Holdings equity will be determined based on the share price transacted at the most recent material liquidity event (the greater of $25m or 1% of outstanding equity) if within 3 months, otherwise the value of GYG US will just be paid out in cash

### Step 3: How many shares in GYG Holdings should be issued?

- This is simply taking the value of NALT's share of value created in GYG US at the point of vesting and dividing it by the agreed GYG Holdings share price to determine how many shares in GYG Holdings equate to the same value of NALT's vested share of the value created in GYG US

## SIMPLE EXAMPLE - EXAMPLE YEAR 5 NUMBERS



*US$m*

a)
| | |
|---|---|
| GYG US LTM Network Sales | $150.0m |
| EV / LTM Network Sales | 3.5x |
| GYG US Enterprise Value | $525.0m |

b)
| | |
|---|---|
| NALT Share of Value Created - Vested % | 2.5% |
| Indicative Value of NALT Vested Share | $13.1m |



Example GYG Holdings Share Price at Time of Vesting in Year 5
= A$11,000 per share



| | |
|---|---|
| Indicative Value of NALT Vested Share (US$m) | $13.1m |
| AUD/USD Exchange Rate | 0.75 |
| Indicative Value of NALT Vested Share (A$m) | $17.5m |
| GYG Holdings Share Price (A$/sh) | $11,000 |
| No. of GYG Holdings Shares Issued ('000) | 1.59 |

3

# Step ① : What is the Value of GYG US Equity?

## QSR EV / NETWORK SALES COMPARABLES

Key comparables - namely Domino's ANZ and the international high-growth peers - trade around 2.5x to 3.5x LTM network sales. Given GYG's significant whitespace potential and high network sales growth, we believe a fair value for GYG US would be towards the top end of this range







| **Network Sales (US$m)** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **LTM** | 2,820 | 7,194 | 2,160 | 944 | 106,620 | 55,459 | 34,423 | n.d. | 2,056 |
| **NTM** | 3,241 | 8,366 | 2,617 | 1,318 | 116,452 | 59,264 | 39,535 | n.d. | 1,976 |

1. As at 29 October 2021

4

# Step ① : What is the Value of GYG US Equity?

## _INDICATIVE_ SUMMARY GYG US FINANCIAL MODEL

| Summary US P&L (US$m) | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e | CY2027e |
|---|---|---|---|---|---|---|
| **Store Count** | | | | | | |
| Corporate Stores | 4 | 9 | 13 | 17 | 21 | 25 |
| Franchise Stores | 0 | 0 | 5 | 35 | 90 | 162 |
| **Total Stores** | **4** | **9** | **18** | **52** | **111** | **187** |
| _Net Adds - Total_ | _2_ | _5_ | _9_ | _34_ | _59_ | _76_ |
| _Net Adds - Corporate_ | _2_ | _5_ | _4_ | _4_ | _4_ | _4_ |
| _Net Adds - Franchise_ | _0_ | _0_ | _5_ | _30_ | _55_ | _72_ |
| **Total Network Sales** | | | | | | |
| Corporate Network Sales | 6.4 | 14.4 | 24.7 | 34.1 | 43.8 | 53.8 |
| Franchise Network Sales | 0.0 | 0.0 | 5.5 | 44.3 | 139.1 | 282.4 |
| **Total Network Sales** | **6.4** | **14.4** | **30.2** | **78.5** | **182.9** | **336.2** |
| _Growth %_ | | _123.3%_ | _110.3%_ | _159.8%_ | _133.2%_ | _83.8%_ |
| _Delivery % of Sales_ | _10.0%_ | _10.0%_ | _10.0%_ | _10.0%_ | _10.0%_ | _10.0%_ |
| **Corporate Stores** | | | | | | |
| Sales | 6.4 | 14.4 | 24.7 | 34.1 | 43.8 | 53.8 |
| Gross Profit | 4.3 | 9.6 | 16.5 | 23.0 | 29.6 | 36.5 |
| _Gross Profit %_ | _66.6%_ | _66.8%_ | _67.0%_ | _67.4%_ | _67.6%_ | _67.8%_ |
| Cost of Doing Business (CODB) | (3.5) | (7.6) | (12.8) | (17.6) | (22.3) | (27.1) |
| _CODB %_ | _54.4%_ | _52.8%_ | _52.0%_ | _51.5%_ | _50.9%_ | _50.4%_ |
| EBITDA | 0.8 | 2.0 | 3.7 | 5.4 | 7.3 | 9.4 |
| _EBITDA %_ | _12.2%_ | _14.0%_ | _15.0%_ | _15.9%_ | _16.7%_ | _17.4%_ |
| **Franchise Stores** | | | | | | |
| Net Franchising Income | | | 0.1 | 0.5 | 1.9 | 5.0 |
| _Royalty %_ | | | _1.0%_ | _1.1%_ | _1.3%_ | _1.8%_ |
| **US EBITDA** | | | | | | |
| G&A | (2.8) | (4.1) | (5.6) | (7.0) | (8.9) | (10.7) |
| _% of Network Sales_ | _44.0%_ | _28.9%_ | _18.6%_ | _8.9%_ | _4.9%_ | _3.2%_ |
| _% of Corporate Sales_ | _44.0%_ | _28.9%_ | _22.8%_ | _20.5%_ | _20.3%_ | _20.0%_ |
| **US EBITDA** | **(2.0)** | **(2.1)** | **(1.9)** | **(1.1)** | **0.3** | **3.6** |
| _US EBITDA %_ | _(31.8%)_ | _(14.9%)_ | _(6.2%)_ | _(1.4%)_ | _0.1%_ | _1.1%_ |

| Summary US Cash Flow (US$m) | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e | CY2027e |
|---|---|---|---|---|---|---|
| US EBITDA | (2.0) | (2.1) | (1.9) | (1.1) | 0.3 | 3.6 |
| Less: Tax | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Less: Capex | (3.4) | (8.6) | (7.0) | (7.4) | (8.0) | (9.0) |
| **Unlevered Free Cash Flow (ex NWC)** | **(5.5)** | **(10.7)** | **(8.9)** | **(8.5)** | **(7.7)** | **(5.4)** |

## KEY ASSUMPTIONS

The summary financial model, including P&L and cash flow, is indicative and based on the following key assumptions:

- New store unit economics of US$2.2m AUV (c. US$43,000 per week) and 14.9% 4-wall EBITDA in year 1, with sales growing 2.5% p.a. and some margin improvement thereafter as a result of additional leverage across COGS, labour and opex

- Delivery represents 10% of sales

- Franchise royalty fees of 1% in year 1, 2% in year 2, 3% in year 3, 4% in year 4 and 5.5% every year thereafter for all new stores. This is a working assumption for the initial phase to attract franchisees

- G&A based on NALT model for company overheads for the first 5 years - including head office salaries, back-office expenses, marketing investment spend and payments to outside vendors – and rolled forward at a relatively steady percentage of corporate network sales

- Tax losses maintained within the US and carried forward to offset future tax payable

- Capex for new stores of $1.7m and maintenance capex at c. 0.3% of corporate network sales

- Includes some additional head office capex and IT & digital capex, derived as a small percentage of total network sales

5

# Step ① : What is the Value of GYG US Equity?

## *INDICATIVE* GYG US VALUATION

Assuming GYG US trades at 3.5x LTM network sales, the indicative value of NALT's vested share of the value created in GYG US at the end of each calendar year is outlined below - this is a specific point in time estimate and ignores any tax consequences. The sum of these values over the 5 year period is c.US$27m (*cash value, pre conversion to equity*)

| Indicative US Valuation (US$) | | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e |
|---|---|---|---|---|---|---|
| **Years From Start (Jan-2022)** | | 1 | 2 | 3 | 4 | 5 |
| Indicative LTM Network Sales Multiple | ① | | 3.5x | 3.5x | 3.5x | 3.5x |
| LTM Network Sales | ② | | $14.4m | $30.2m | $78.5m | $182.9m |
| **Indicative Enterprise Value** | | | **$50.3m** | **$105.7m** | **$274.6m** | **$640.2m** |
| NALT Share of Value Created - Vested % | ③ | | 2.5% | 2.5% | 2.5% | 2.5% |
| **Indicative Value of NALT Vested Share (US$m)** | | | **$1.3m** | **$2.6m** | **$6.9m** | **$16.0m** |
| **Indicative Value of NALT Vested Share (A$m)** | | | **$1.7m** | **$3.5m** | **$9.2m** | **$21.3m** |

Total of US$26.8m
(A$35.7m)

Notes:

 LTM network sales multiple of 3.5x per page 4.

 Based on GYG US model summary on page 5. Network sales for the 12 months to the end of December in that year.

 NALT share of value created to be converted to GYG Holdings shares within 2.5 months after vesting, so the NALT share of value created vested % does not increase over time (i.e. not cumulative).

6

# Step ② : What is the Value of GYG Holdings Equity?

## METHODS OF VALUATION

The way the value of GYG Holdings equity is determined will vary depending on whether the company is public or private at the point of conversion. For the sake of the analysis today, the _indicative_ value of GYG Holdings equity at the point of conversion is based on TDM's model for GYG Holdings excluding the US and assuming the value of the GYG US business is attributed to GYG Holdings, resulting in an uplift in its share price

### Public 

### VWAP SHARE PRICE

_If GYG is public at the time of conversion, the value of GYG Holdings equity will be determined based on a 30-day volume weighted average price (VWAP) for the stock in the public markets_

### Private



### LATEST ROUND PRICE

### or

### CASH

_If GYG remains private at the time of conversion, the value of GYG Holdings equity will be determined based on the share price transacted at the most recent material liquidity event (the greater of $25m or 1% of outstanding equity) if within 3 months, otherwise the value of GYG US will just be paid out in cash_

### For Analysis Today

### VALUE OF GYG HOLDINGS EXCLUDING THE US + UPLIFT FROM VALUE OF GYG US

**VALUE OF GYG HOLDINGS EXCLUDING THE US**

- Similar to the valuation for GYG US, we value GYG Holdings ex. US based on a multiple of the next 12 months ("NTM") EBITDA given it is relatively more mature

- In this analysis, the _indicative_ NTM EBITDA multiple is 30x in year 2, 25x in years 3 and 4, and 22.5x in year 5

- Once adjusted for net cash or debt, we then divide the equity value by total GYG Holdings diluted shares to arrive at a share price



**UPLIFT FROM VALUE OF GYG US**

- Based on the value we derive for GYG US in Step 1, we calculate what this value represents on a per share basis based on _GYG Holdings_ total diluted shares outstanding

- We expect that the GYG Holdings share price will also reflect the value of GYG US at this point in time, such that the GYG Holdings share price could be represented as that for GYG Holdings excluding the US _plus_ the per share equity value of GYG US

7

# Step ② : What is the Value of GYG Holdings Equity?

## *INDICATIVE* GYG HOLDINGS EQUITY VALUATION - BASED ON TDM BASE CASE

### VALUE OF GYG HOLDINGS EXCLUDING US

| Indicative GYG Holdings Equity Valuation Excluding US (A$) | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e |
|---|---|---|---|---|---|
| Years From Start (Jan-2022) | 1 | 2 | 3 | 4 | 5 |
| **Indicative GYG Holdings Valuation ex. US** | | | | | |
| Indicative NTM EV / EBITDA Multiple | | 30.0x | 25.0x | 25.0x | 22.5x |
| Indicative NTM EBITDA | | $68.9m | $90.7m | $115.0m | $140.6m |
| **Indicative Enterprise Value** | | $2,065.7m | $2,268.7m | $2,873.9m | $3,164.6m |
| Net Cash / (Debt) | | $133.9m | $161.2m | $204.5m | $265.0m |
| **Indicative Equity Value** | | **$2,199.5m** | **$2,429.8m** | **$3,078.4m** | **$3,429.5m** |
| GYG Holdings Diluted Shares Outstanding ('000) | | 368.3 | 373.6 | 379.1 | 384.6 |
| **Indicative Equity Value per GYG Holdings Share (A$/sh)**  | | **$5,973** | **$6,504** | **$8,121** | **$8,918** |

### UPLIFT FROM VALUE OF GYG US

| Indicative US Valuation on a per GYG Holdings Share Basis | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e |
|---|---|---|---|---|---|
| Years From Start (Jan-2022) | 1 | 2 | 3 | 4 | 5 |
| **Indicative GYG US Value (US$)** | | $50.3m | $105.7m | $274.6m | $640.2m |
| GYG Holdings Diluted Shares Outstanding ('000) | | 368.3 | 373.6 | 379.1 | 384.6 |
| **Indicative GYG US Value per GYG Holdings Share (US$/sh)** | | **$136** | **$283** | **$724** | **$1,665** |
| **Indicative GYG US Value per GYG Holdings Share (A$/sh)**  | | **$188** | **$391** | **$1,000** | **$2,299** |

### VALUE OF GYG HOLDINGS EQUITY

| Indicative GYG Holdings Equity Valuation (A$) | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e |
|---|---|---|---|---|---|
| Years From Start (Jan-2022) | 1 | 2 | 3 | 4 | 5 |
| Indicative GYG US Value per GYG Holdings Share (A$/sh) | | $188 | $391 | $1,000 | $2,299 |
| Indicative GYG Holdings Equity Value per Share (A$/sh) | | $5,973 | $6,504 | $8,121 | $8,918 |
| **GYG Holdings Share Price Incl US Value Uplift (A$/sh)** ⓐ + ⓑ | | **$6,161** | **$6,894** | **$9,121** | **$11,216** |

8

# Step ③ : How Many Shares in GYG Holdings Should be Issued?

Based on the indicative calculations below , NALT would be issued up to a total of c.3,700 shares in GYG Holdings over the 5 year period. This represents a cumulative total value of US$27m or A$36m, _based on adding up the indicative value of NALT's vested share at the end of each year (i.e. annual conversion and sale) and ignoring any tax consequences_

| Conversion to GYG Holdings Equity | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e |
|---|---|---|---|---|---|
| Years From Start (Jan-2022) | 1 | 2 | 3 | 4 | 5 |
| Indicative GYG US Value (US$) | | $50.3m | $105.7m | $274.6m | $640.2m |
| NALT Share of Value Created - Vested % | | 2.5% | 2.5% | 2.5% | 2.5% |
| Indicative Value of NALT Vested Share (US$m) | | $1.3m | $2.6m | $6.9m | $16.0m |
| Indicative Value of NALT Vested Share (A$m) | | $1.7m | $3.5m | $9.2m | $21.3m |
| GYG Holdings Share Price Incl US Value Uplift (A$/sh) | | $6,161 | $6,894 | $9,121 | $11,216 |
| No. of GYG Holdings Shares to be Issued to NALT ('000) | | 0.27 | 0.51 | 1.00 | 1.90 |

Total of c.3,700 GYG Holdings shares issued

Note, the above represents the maximum number of shares in GYG Holdings that would be issued at each vesting date. The US related performance rights will ultimately be settled via a combination of GYG Holdings shares and cash, with the split between shares / cash depending on the tax payable on the value of the shares to be issued at vesting. See the following page for further detail on tax considerations.

9

# What is the Value of GYG Holding Shares Issued?

## ANNUAL CONVERSION INCLUDING TAX CONSIDERATIONS

Assuming the GYG Holdings shares issued are all sold on conversion each year, at a tax rate of 37% the net value outlined on the prior page comes down to US$17m or A$23m. Alternatively, NALT could sell just enough GYG Holdings shares to cover the tax payable and hold the rest of the shares to benefit from expected future value creation in GYG Holdings. Under this scenario, the GYG Holdings shares would have a value of c.$20m at year 5 and this value would be expected to continue to appreciate over time

| GYG Holdings Equity Value | | CY 2022e | CY 2023e | CY 2024e | CY 2025e | CY 2026e | CY 2027e |
|---|---|---|---|---|---|---|---|
| Years From Start (Jan-2022) | | 1 | 2 | 3 | 4 | 5 | 6 |
| Indicative Value of NALT Vested Share in the Year (US$m) | | | $1.3m | $2.6m | $6.9m | $16.0m | $0.0m |
| Tax Payable @ 37% (US$m) | | | $0.5m | $1.0m | $2.5m | $5.9m | $0.0m |
| Tax Payable @ 37% (A$m) | | | $0.6m | $1.3m | $3.4m | $7.9m | $0.0m |
| GYG Holdings Share Price Inl US Value Uplift (A$/sh) | | | $6,161 | $6,894 | $9,121 | $11,216 | $13,600 |
| GYG Holdings Shares to be Sold to Cover Tax Payable ('000) | | | 0.10 | 0.19 | 0.37 | 0.70 | 0.00 |
| Remaining GYG Holdings Shares Held ('000) | | | 0.17 | 0.32 | 0.63 | 1.20 | 0.00 |
| Cumulative GYG Holdings Shares Held ('000) | | | 0.17 | 0.49 | 1.13 | 2.32 | 2.32 |

| | CY 2022e | CY 2023e | CY 2024e | CY 2025e | CY 2026e | CY 2027e |
|---|---|---|---|---|---|---|
| GYG Holdings Share Price Inl US Value Uplift (A$/sh) | | $6,161 | $6,894 | $9,121 | $11,216 | $13,600 |
| Cumulative Value of Remaining GYG Holdings Shares (A$m) | | $1.1m | $3.4m | $10.3m | $26.1m | $31.6m |
| Cumulative Value of Remaining GYG Holdings Shares (US$m) | | $0.8m | $2.6m | $7.7m | $19.6m | $23.7m |

Total of c.2,300 GYG Holdings shares still held at year 5 at a value of c.US$20m

The value of this holding increases to c.US$24m if held through year 6

10

# Alternative Step ③ Consideration: How Many Shares in GYG Holdings Issued if Annual Conversion Not Required?

If annual conversion was not required and NALT could elect to delay conversion to GYG Holdings shares to some time up to and including year 5, the below table outlines the value of NALT's vested share and the number of GYG Holdings shares to be issued assuming NALT's vested share of value created is carried through to the end of that year. Based on the indicative calculations below, NALT would be issued up to a total of c.7,600 shares in GYG Holdings at the end of year 5. This represents a pre-tax value of c.US$64m or A$85m, based on the value of GYG US at that point in time. Assuming the 37% tax rate, the post-tax value is c.US$40m

| Conversion to GYG Holdings Equity | CY2022e | CY2023e | CY2024e | CY2025e | CY2026e |
|---|---|---|---|---|---|
| **Years From Start (Jan-2022)** | 1 | 2 | 3 | 4 | 5 |
| **Indicative GYG US Value (US$)** | | $50.3m | $105.7m | $274.6m | $640.2m |
| NALT Share of Value Created - Vested % (cumulative) | | 2.5% | 5.0% | 7.5% | 10.0% |
| **Indicative Value of NALT Vested Share (US$m)** | | $1.3m | $5.3m | $20.6m | $64.0m |
| **Indicative Value of NALT Vested Share (A$m)** | | $1.7m | $7.0m | $27.5m | $85.4m |
| GYG Holdings Share Price Incl US Value Uplift (A$/sh) | | $6,161 | $6,894 | $9,121 | $11,216 |
| **No. of GYG Holdings Shares to be Issued to NALT ('000)** | | 0.27 | 1.02 | 3.01 | 7.61 |

Maximum of c.7,600 GYG Holdings shares issued in year 5

11

# Preliminary Tax Considerations

- The performance rights will be issued to each member of the NALT

- Based on tax advice received, the performance rights are required to be converted into shares within 2.5 months of vesting

- The shares are taxable when they are issued in the hands of each NALT member

- The Company (GYG Holdings) has an obligation to withhold the tax payable on the value of the shares that vest

- It is intended that performance rights convert into a combination of cash and shares so that the relevant tax can be withheld

# EXHIBIT C



**Private and confidential**

JUNE 27 2022

Robert Alan Fulmer
513 Cantor, Irvine, CA, 92620
United States

**Offer to participate in the Guzman y Gomez 2022 US Employee Long Term Incentive Plan (Offer)**

Guzman y Gomez (Holdings) Ltd ACN 125 554 743 (**Company**) has invited you to participate in the Company's US Employee Long Term Incentive Plan (the **Plan**) on the terms of this letter and the terms set out in the enclosed Plan rules (**Plan Rules**).

Capitalised terms which are not defined in this letter have the meanings given in the Plan Rules.

## 1    Terms of grant

| Term | Description |
|---|---|
| **Grant Date:** | The date on which the performance right is registered in your name in the register of performance rights maintained by the Company. |
| **Grant Condition:** | This Offer, and the grant of your performance rights pursuant to this Offer, is subject to you remaining employed or engaged as a director by the Company or one of its subsidiaries (**GYG Group**) as at the Grant Date and neither you nor the relevant GYG Group member having issued a notice of termination as at the Grant Date. |
| **Number of Performance Rights:** | One performance right (**PR**) subject to the Vesting Conditions set out below. |
| **Entitlement:** | Subject to the terms and conditions of this Offer and the Plan Rules, a _vested_ PR will entitle you, upon the exercise of the PR, to acquire by way of new issue, ordinary shares in the Company calculated as follows: $$OS = [(3.5 \times LTM\ Network\ Sales \times RP) \times AP] \div VWAP$$ Where: **OS** means the number of ordinary shares in the Company you will be issued (rounded down to the nearest whole number); **LTM Network Sales** means the last twelve months (**LTM**) of actual network sales (excluding any one-off or extraordinary revenue items) generated by the GYG Group's stores (including company-owned and franchise stores) in the United States (expressed in US dollars and then, for the purpose of this formula, converted to Australian dollars using the month-end exchange rate as sourced from Oanda.com as at the end of that LTM period (or if that source is not available, then sourced from another reputable source of exchange rate as determined by the Company acting in good faith)). The LTM Network Sales must be based on audited figures or otherwise reviewed by a suitable expert determined by the Board in accordance with ASX guidance, as applicable at the relevant time; |

| Term | Description |
|---|---|
| | RP means 10%, being the relevant percentage of the deemed value of the US GYG business (calculated as 3.5 x LTM Network Sales) available to be allocated to the participants in the Plan; |
| | AP means the Allocation Percentage as defined in the next row of this table; and |
| | VWAP means: |
| | • if the Company is not listed on a recognised securities exchange on the relevant Vesting Date, the Fair Market Value (defined below) of an ordinary share in the Company as at the Vesting Date; or |
| | • if the Company is listed on a recognised securities exchange on the relevant Vesting Date, the 30-day volume weighted average price of shares in the Company traded on that exchange leading up to and including the Vesting Date (provided that if the Company has been listed for less than 30 days, the VWAP will be calculated on the 30th trading day). |
| Allocation Percentage: | 1.9%, which is out of the total 10% pool available for allocation. |
| Board discretion to cash-out | In the event that the VWAP is to be determined in the limited scenario where: |
| | • the Company is not listed on a recognised securities exchange on the relevant Vesting Date; and |
| | • there has been no Material Liquidity Event (as defined below under 'Fair Market Value') in the last 3 months prior to the Vesting Date, |
| | then it is anticipated that the Board may, rather than issuing the number of ordinary shares in the Company calculated as your Entitlement on exercise of a vested PR, satisfy that obligation by paying a cash amount equal to [(3.5 x LTM Network Sales x RP) x AP]. |
| Issue Price: | Nil consideration will be payable for the grant of the PR pursuant to this Offer. |
| Exercise Price: | There is no exercise price payable on the exercise of a PR. |
| Vesting Date: | The date for testing the Vesting Conditions will be 30 June 2027. |
| Vesting Period: | The period between the Grant Date and the Vesting Date. |

| Term | Description |
|---|---|
| **Vesting Conditions:** | Subject to the Plan Rules, an unlapsed PR will vest and become exercisable if the Vesting Conditions have been satisfied (or waived by the Board) on the Vesting Date or if the PR otherwise vests in accordance with the Plan Rules. |
| | Your unlapsed PR will vest and become exercisable if each of the following conditions are satisfied on the Vesting Date: |
| | • you are (and continuously have been from the Grant Date) an employee or engaged as a director of a GYG Group member except that any periods of unpaid leave may be a factor (at the discretion of the Board) when considering whether you have satisfied this Vesting Condition; and |
| | • the GYG Group's stores (including company-owned and franchise stores) in the United States have generated LTM Network Sales of at least US$160 million. |
| **Vesting and exercise:** | Vesting Conditions may be reduced or waived in whole or in part at any time by the Board. The Company will give you a Vesting Notice upon the Vesting Conditions being satisfied or waived by the Board. |
| | Subject to the relevant Vesting Conditions having been satisfied or waived, and the PR not having lapsed in accordance with the Plan Rules, the PR specified in a Vesting Notice will be automatically exercised as soon as practicable (and in any event within 20 Business Days from the Vesting Notice being given). |
| | The Company will allot and issue the number of Shares which you are entitled to receive through the exercise of the PR as soon as practicable. |
| | By exercising a PR, you will be taken to have agreed to have become a shareholder of the Company and be bound by the constitution of the Company and, if applicable, to enter into an accession deed to be bound by the shareholders' deed of the Company. |
| **Lapse of PR:** | Unless the Board determines otherwise, your PR will lapse (and all of your rights under the Plan in respect of the PR will be forfeited) in the circumstances specified in Rule 9 of the Plan Rules. |
| **PR and restrictions attaching to PR:** | Your PR will be subject to the rights and restrictions set out in this Offer, and the Plan Rules (including the restrictions on transfer in accordance with Rule 10 of the Plan Rules). |
| | In particular, you may not: |
| | • engage in any Dealing with a PR or interest in a PR except in accordance with the Plan Rules; or |
| | • enter into any arrangement for the purpose of hedging, or otherwise affecting your economic exposure to a PR. |
| **Cessation of employment or engagement:** | If you cease to be an Employee at any time while you hold an outstanding PR, your PR will be treated in accordance with Rule 12 of the Plan Rules. |

| Term | Description |
|---|---|
| **Additional disposal restrictions on Shares issued on exercise of a PR:** | You will be restricted from trading in Shares issued on the exercise of your PR for 12 months pursuant to an escrow deed in accordance with Rule 8.8 of the Plan Rules. |
| **Fair Market Value** | The value of an ordinary share in the Company by reference to the most recent material liquidity event within the last 3 months prior to the Vesting Date, being a dealing in (including an issuance of) ordinary shares in the Company that is at least the greater of (at the relevant time) shares representing:

• A$25 million by value; or

• 1% of the issued ordinary shares of the Company

**(Material Liquidity Event).**

If there has been no Material Liquidity Event in the last 3 months prior to the Vesting Date (and the Board has not exercised its discretion to cash-out the Entitlement), the Fair Market Value must be determined by the Board acting reasonably having regard to the following valuation principles:

• the amount a willing (but not anxious) buyer would be prepared to pay to a willing (but not anxious) seller for the ordinary shares in the Company (without applying any premium for control nor any minority discount);

• the historical financial performance of the GYG Group and the profit, strategic positioning, future prospects and undertaking of the GYG business;

• perform the valuation in accordance with accounting principles and practices generally accepted in Australia and applied consistently; and

• take into account any other matter (not inconsistent with the above) that the Board considers is reasonable and appropriate. |
| **Tax and social security withholding** | Notwithstanding the right to receive ordinary shares in the Company on exercise of a vested PR as described under "*Entitlement*" above, if there is an obligation on any GYG Group member to withhold tax or social security payments (including on the value of any such shares to be issued) (such amount being the **Withholding Amount**), the Company may at its discretion elect to partly satisfy the obligation to issue shares with a cash payment equal to the value of the shares corresponding to the Withholding Amount for the purpose of the relevant GYG Group Member meeting its obligation to remit the withheld amount to the relevant tax authority. |
| **Clawback:** | If the Board becomes aware of a material misstatement in the GYG Group's financial statements relating to a Vesting Period or some other event has occurred during the Vesting Period which, as a result, means your PR should not have vested, the Board may elect to claw back the benefit of that vesting. See Rule 15 of the Plan Rules for further details. |

| Term | Description |
|---|---|
| Other terms and conditions: | The PR does not entitle you to receive notice of, or to attend or vote at, meetings of members of the Company or to receive any dividends on Shares. |
| | In the event that the Company is listed, the PR will not be quoted on the relevant securities exchange. |
| | For all other terms and conditions, refer to the Plan Rules. |
| Future offers and relationship with your employment terms | This Offer does not automatically entitle you to participate in future offers under the Plan. Eligibility to participate in any future offer under the Plan is determined by the Board in its absolute discretion. |
| | Participation in the Offer is not a term of your employment, does not form part of your remuneration base and does not affect your contract of employment. |

## 2    What do you need to do to participate in the Plan?

You should read this Offer and the Plan Rules carefully before deciding whether or not to apply to participate in the Plan.

If you wish to apply to participate in the Plan, please complete, sign and return the Application (enclosed as Attachment B) by 5:00pm Sydney time on 24 June 2022 to the Company via email: legal@qyg.com.au.

The PR may only be issued to you in your personal capacity, and not to any other nominated entity.

Following receipt by the Company of a duly completed and executed Application, then, subject to the satisfaction of the Grant Condition, the Company may issue your PR. The Company will be deemed to have accepted your Application to acquire the PR on the registration of your PR in your name in the register of performance rights maintained by the Company. You do not need to pay any money to receive the PR.

This Offer will lapse if you do not accept the Offer in accordance with the Plan Rules by 5:00pm Sydney time on 24 June 2022 and may be withdrawn by the Board at any time prior to the Grant Date in accordance with the Plan Rules.

## 3    Taxation

There may be tax implications arising for you in participating in the Plan. If you intend to apply to participate in the Plan, you must make your own independent assessment and investigation in relation to your tax position including seeking professional advice. You must base any decision you make on such independent assessment, investigation or advice.

## 4    Risks of acquiring and holding PR and Shares

Participating in the Plan involves a number of risks including that:

- While a PR will entitle you on the exercise of the PR to receive Shares, a PR is not a Share and until a PR is exercised in accordance with the Plan Rules, the PR is at risk of lapsing in the circumstances specified in the Plan Rules. If a PR lapses (for example, because a Vesting Condition applicable to the

PR is not satisfied or waived), all of your rights under the Plan in respect of that PR (including your right to receive Shares) will be forfeited.

- Whether or not your PR will vest and become exercisable will depend on the Vesting Conditions applicable to the PR being satisfied or waived by the Board. The Vesting Conditions applicable to the PR the subject of this Offer are outlined above.

- Your PR is not a Share and may be treated differently to Shares in certain corporate actions. On exercise of your PR, you will receive shares in the Company which may be listed at the time or unlisted and therefore illiquid and subject to disposal restrictions.

- Holding PR and Shares may have tax implications for you and the tax regime applying to you may change.

The information above is only general information about the risks of acquiring and holding PR and Shares. There may be other risks of participating in the Plan that are specific to your circumstances.

## 5   No financial product advice

No financial product advice is provided in this Offer and nothing in this Offer should be taken to constitute a recommendation or statement of opinion that is intended to influence a person or persons in making a decision to participate in the Plan. This Offer does not take into account the objectives, financial situation or needs of any particular person. Before acting on the information contained in this Offer, or making a decision to participate in the Plan, you should seek professional advice from an independent person who is licensed qualified to give such advice as to whether participation in the Plan is appropriate in light of your own circumstances.

## 6   Plan Rules

This Offer is subject to the Plan Rules. To the extent that there is any inconsistency between the Offer and the Plan Rules, the terms of this Offer will apply in priority to the extent of that inconsistency.

## 7   How do you obtain further information?

If you have any questions about this Offer or the Plan, please contact the Company via email: legal@gyg.com.au.

Yours sincerely

Hilton Brett
Director & Chair of Remuneration Committee

Signed for and on behalf of Guzman y Gomez (Holdings) Limited

**Attachment A**

**US Employee Long Term Incentive Plan Rules**

CONFIDENTIAL

Attachment B

US EMPLOYEE LONG TERM INCENTIVE PLAN

APPLICATION

Please read your Offer and the documents enclosed with your Offer before completing this form. Capitalised terms used in this Application have the same meaning as in your Offer.

**1   Participant's details**

Please insert your details in the box below:

| Participant's name: | |
|---|---|
| Participant's address: | |

**2   Number of PR**

| Number of PR: | One performance right as described in the Offer. |
|---|---|

**3   Application**

By signing this Application, the Participant:

(a)   applies to participate in the Plan;

(b)   agrees to be bound by the Plan Rules, and the terms and conditions of the Offer and this Application;

(c)   irrevocably offers to acquire the PR specified above in section 2 (and Shares upon the exercise of any such PR) under, and subject to, the Plan Rules and on, and subject to, the terms and conditions of the Offer and this Application;

(d)   acknowledges that the number of Shares that they may become entitled to is dependent on the terms set out in the Offer, the satisfaction of the relevant Vesting Conditions and the operation of the Plan Rules; and

(e)   acknowledges and agrees that they have had the opportunity to obtain independent advice and have satisfied themselves regarding the financial and taxation consequences of any participation in the Plan.

CONFIDENTIAL

**DECLARATIONS AND SIGNATURE** – Please read the following declarations and print your name, sign and date the form, in the space provided.

By signing this Application, the Participant declares that:

(a)     all the details provided in this application form are true and correct;

(b)     they have read and understood the Offer, Plan Rules and this Application;

(c)     they agree to the appointment of the attorney pursuant to Rule 19 of the Plan Rules; and

(d)     they agree to the matters set out in the enclosed US Investor Certificate.

**Executed as a deed poll**

Full name of Participant:

ROBERT A. FULMER

Signature of Participant:

Full name of Witness:

ROBERTA W. FULMER

Signature of Witness:

Date: 6 - 27 - 2022

This Application must be completed and returned to the Company by email (legal@gyg.com.au) by no later than 5:00pm Sydney time on 24 June 2022.

**CONFIDENTIAL**

Enclosure

## Guzman Y Gomez (Holdings) Limited

### U.S. Investor Certificate – US Employee Long Term Incentive Plan

The Participant makes this certificate in connection with his/her receipt of performance rights to acquire ordinary shares (the "Shares") of Guzman Y Gomez (Holdings) Limited, an Australian company (the "Company"), pursuant to the terms and conditions of the Company's US Employee Long Term Incentive Plan and an invitation letter received from the Company.

The Participant certifies that he/she:

1.  is receiving the performance right, and may acquire Shares, for his/her own account with the present intention of holding these securities for the purpose of investment and not with the intention of selling these securities in a public distribution in violation of the U.S. federal securities laws or any applicable state securities law.

2.  understands that:

    (a)  these securities have not been, and will not be, registered under the U.S. Securities Act of 1933 or the securities laws of any U.S. state; and

    (b)  these securities will be "restricted securities" under the Securities Act and cannot be transferred or sold unless they are (i) registered under the Securities Act; (ii) sold or transferred in a transaction exempt from registration under the Securities Act or (iii) sold outside the United States in compliance with Regulation S under the Securities Act.

3.  confirms that he/she:

    (a)  has received a copy of the Company's US Employee Long Term Incentive Plan Rules;

    (b)  is knowledgeable in relation to the business of the Company and capable of evaluating the merits and risks of an investment in the Shares, including any income tax consequences upon any vesting as well as acquisition and disposition of the Shares;

    (c)  has been afforded access to information about the Shares and the Company, including publicly available information that is available from the website of the Company;

    (d)  understands that any purchase of the Shares involves a degree of risk; and

    (e)  is able to bear the economic risk of any investment in the Shares.

# EXHIBIT D

## MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement (the "Agreement") is made and entered into, as of [INSERT DATE] ("Effective Date"), by and between Guzman Y Gomez, Corp ("Company"), having a principal place of business at 2711 Centreville Road, Suite 44 Wilmington New Castle County Delaware, 19808 and [INSERT OTHER PARTY NAME], having a principal place of business at [INSERT OTHER PARTY ADDRESS] ("Other Party").

1. <u>Definition of Confidential Information</u>. "Confidential Information" means (a) any financial, technical and non-technical information related to a party's business and current, future and proposed products and services of each of the parties, including for example and without limitation, each party's respective information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information and marketing plans and (b) any information a party has received from a third party that may be disclosed and which that party has an obligation to the third party to treat as confidential or proprietary, except that information disclosed by Discloser (defined below) will be considered Confidential Information of Discloser by Recipient (defined below), only if the information (a) is provided as information fixed in tangible form or in writing (e.g., paper, disk or electronic mail), is conspicuously designated as "Confidential" (or with some other similar legend) or (b) if provided orally or visually, is identified as confidential at the time of disclosure and confirmed in writing within thirty (30) days of disclosure. For purposes of this Agreement, "Discloser" means the party disclosing its Confidential Information to the other party, who shall be referred to in this Agreement as "Recipient".

2. <u>Nondisclosure and Nonuse Obligations</u>. Recipient will not use any Confidential Information except to the extent

necessary for the purpose described below the signatures to this Agreement (the "Purpose") and Recipient will not disseminate or in any way disclose any Confidential Information to any third party, except as such disclosure is expressly permitted in this Agreement. Furthermore, neither party may disclose the existence of any negotiations, discussions or consultations in progress between the parties to any third party or make any public announcement of such negotiations, discussions or consultations without the prior written approval of the other party. Recipient shall treat all of Discloser's Confidential Information with the same degree of care as Recipient accords to Recipient's own Confidential Information, but not less than reasonable care. Recipient shall disclose Discloser's Confidential Information only to those of Recipient's employees, consultants and contractors who need to know the information to assist Recipient with respect to the Purpose. Recipient certifies that each of its employees, consultants and contractors will have agreed, either as a condition of employment or in order to obtain Discloser's Confidential Information, to be bound by terms and conditions substantially similar to those terms and conditions applicable to Recipient under this Agreement.

3. <u>Exclusions from Nondisclosure and Nonuse Obligations</u>. Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) do not apply to any information that Recipient can demonstrate: (a) is publicly available at or subsequent to the time the Confidential Information was communicated to Recipient by Discloser through no fault of Recipient; (b) is rightfully in Recipient's possession free of any obligation of confidence at or subsequent to the time the Confidential Information was communicated to Recipient by Discloser; (c) is developed by employees or agents of Recipient independently of and without use of or reference to any of Discloser's Confidential Information; or (d) is communicated by Discloser to an unaffiliated third party free of

1

any obligation of confidence. A disclosure by Recipient of any of Discloser's Confidential Information (1) in response to a valid order by a court or other governmental body; (2) as otherwise required by law; or (3) necessary to establish the rights of either party under this Agreement shall not be considered to be a breach of this Agreement by Recipient; provided, however, that Recipient provides prompt prior written notice thereof to Discloser to enable Discloser to seek a protective order or otherwise prevent the disclosure. Notwithstanding the foregoing, to the extent that Recipient receives any personal information or personal data, that information and data shall remain subject to the non-disclosure and non-use obligations of this Agreement even if that information would otherwise fall under one of the foregoing exceptions.

4. <u>Ownership and Return of Confidential Information and Other Materials</u>. All of Discloser's Confidential Information and Evaluation Material are the property of Discloser and no license or other rights to Discloser's Confidential Information or Evaluation Material is granted or implied hereby. "Evaluation Material" means all reports, studies, analyses, interpretations, compilations, memoranda, notes and any other written or electronic materials prepared by Recipient or any of its Representatives which contain, reflect or are derived from or based, in whole or in part, upon any Confidential Information of Discloser. "Representatives" means and includes a party's directors, officers and other employees, as well as their financial advisors, legal counsel, accountants, consultants and other advisors, agents and representatives. All materials (including, without limitation, documents, drawings, papers, storage media, tapes, models, apparatus, sketches, designs and lists) furnished by Discloser to Recipient (whether or not they contain or disclose Discloser's Confidential Information) are the property of Discloser. Within five (5) days after any request by Discloser, Recipient shall, to the extent reasonably possible, destroy (including delete) or deliver to Discloser, at Discloser's option, (a) all Discloser-furnished materials and (b) all

materials in Recipient's possession or control (even if not Discloser-furnished) that contain or disclose any of Discloser's Confidential Information or Evaluation Material, except that Recipient may keep a copy of Discloser's Confidential Information if required for its records to establish its compliance with this Agreement. Upon Request, Recipient will provide Discloser a written certification of Recipient's compliance with Recipient's obligations under this Section.

5. <u>Independent Development</u>. Recipient may currently or in the future be developing information internally, or receiving information from other parties that may be similar to Discloser's Confidential Information. Accordingly, nothing in this Agreement will be construed as a representation or inference that Recipient will not develop or have developed products or services, that, without violation of this Agreement, might compete with the products or systems contemplated by Discloser's Confidential Information.

6. <u>Disclosure of Third Party Information</u>. Neither party shall communicate any information to the other in violation of the proprietary rights of any third party.

7. <u>No Warranty</u>. All Confidential Information is provided by Discloser "AS IS" and without any warranty, express, implied or otherwise, regarding the Confidential Information's completeness, accuracy or performance.

8. <u>No Export</u>. Recipient will obtain any licenses or approvals the U.S. government or any agency thereof requires prior to exporting, directly or indirectly, any technical data or technical information acquired from Discloser pursuant to this Agreement or any product utilizing that data or information.

9. <u>Term</u>. This Agreement shall govern all communications between the parties that are made from the Effective Date to the date on which either party receives from the other

2

written notice that subsequent communications shall not be so governed; provided, however, that Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will continue in perpetuity with respect to Discloser's Confidential Information that Recipient has previously received until the obligations no longer apply pursuant to Section 3 (Exclusions from Nondisclosure and Nonuse Obligations).

10.  No Assignment.  Neither party will assign or transfer any rights or delegate any performance under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.  Any assignment of rights or delegation of performance in violation of this Section is void.

11.  Injunctive Relief.  A breach by Recipient of this Agreement will cause irreparable and continuing damage to Discloser for which money damages are insufficient, and Discloser shall be entitled to seek injunctive relief and/or a decree for specific performance, and other relief as may be proper (including money damages if appropriate).

12.  Defend Trade Secrets Act.  Pursuant to the Defend Trade Secrets Act of 2016, if Other Party is an individual, Other Party acknowledges that he/she shall not have criminal or civil liability under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  In addition, if Other Party files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Other Party may disclose the trade secret to Other Party's attorney and may use the trade secret information in the court proceeding, if Other Party (X) files any document containing the trade secret under seal and (Y) does not disclose the trade secret, except pursuant to court order.

13.  Notices.  Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated:  (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; (d) by email, effective (A) when the sender receives an automated message from the recipient confirming delivery or (B) one hour after the time sent (as recorded on the device from which the sender sent the email) unless the sender receives an automated message that the email has not been delivered, whichever happens first, but if the delivery or receipt is on a day which is not a business day or is after 5:00 pm (addressee's time) it is deemed to be received at 9:00 am on the following business day; or (e) by certified or registered mail, return receipt requested, upon verification of receipt.  Notices to each party shall be sent to the address first written above for each party, or other address as a party may provide in writing.

14.  Governing Law; Forum.  The laws of the United States of America and the State of Illinois govern all matters arising out of or relating to this Agreement without giving effect to any conflict of law principles. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in the county and state where the Company's headquarters, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of the federal or state courts located in the county and state where the Company's headquarters are located, such personal jurisdiction will be non-exclusive.  Additionally, notwithstanding anything in the foregoing to the contrary, a claim for equitable relief arising out of or related to this Agreement may be brought in any court of competent jurisdiction. If a proceeding is commenced to resolve any dispute that arises between the parties with respect to the matters covered by this Agreement, the prevailing party in that proceeding is entitled to receive its reasonable attorneys' fees, expert witness fees

3

and out-of-pocket costs, in addition to any other relief to which that prevailing party may be entitled.

15.    Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable,  (a) that provision shall be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

16.    Waiver; Modification.  If a party waives any term, provision or a party's breach of this Agreement, such waiver shall not be effective unless it is in writing and signed by the party against whom such waiver is asserted.  No waiver by a party of a breach of this Agreement by the other party shall constitute a waiver of any other or subsequent breach by such other party.  This Agreement may be modified only if authorized representatives of both parties consent in writing.

17.    Entire    Agreement.    This Agreement constitutes the final and exclusive agreement between the parties with respect to the treatment of Confidential Information disclosed hereunder.  It supersedes all agreements, whether prior or contemporaneous, written or oral, concerning the subject matter of this Agreement.

4

IN WITNESS WHEREOF, the parties are signing this Agreement as of the Effective Date.

"Company"                                "Other Party"

GUZMAN Y GOMEZ, CORP              [INSERT NAME]


By: _____          By: _____

[INSERT NAME]                            [INSERT NAME]

[INSERT TITLE]                           [INSERT TITLE]

Purpose: [INSERT PURPOSE, FOR EXAMPLE: DISCUSSIONS RELATED TO DESIGN SERVICES]

5

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>STREET ADDRESS: 1275 N. Berkeley Ave<br>MAILING ADDRESS: 1275 N. Berkeley Ave<br>CITY AND ZIP CODE: Fullerton 92838<br>BRANCH NAME: North Justice Center | *FOR COURT USE ONLY*<br>**FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE |
|---|---|
| PLANTIFF: Creed Unco, LLC et.al. | |
| DEFENDANT: Guzmn Y Gomez (Holdings) Limited et.al. | **Jun 30, 2023**<br>Clerk of the Superior Court |
| Short Title: CREED UNCO, LLC VS. GUZMN Y GOMEZ (HOLDINGS) LIMITED | |
| **NOTICE OF HEARING**<br>**CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>30-2023-01333752-CU-FR-NJC |

Please take notice that a(n), <u>Case Management Conference</u> has been scheduled for hearing on <u>11/30/2023</u> at <u>08:30:00 AM</u> in Department <u>N06</u> of this court, located at <u>North Justice Center</u>.

**Plaintiff(s)/Petitioner(s) to provide notice to all defendant(s)/respondent(s). Parties who file pleadings that add new parties to the proceeding must provide notice of the Case Management Conference to the newly added parties.**

<u>IMPORTANT:</u> Prior to your hearing date, please check the Court's website for the most current instructions regarding how to appear for your hearing and access services that are available to answer your questions.
Civil Matters - https://www.occourts.org/media-relations/civil.html
Probate/Mental Health - https://www.occourts.org/media-relations/probate-mental-health.html
Appellate Division - https://www.occourts.org/media-relations/appeals-records.html

<u>IMPORTANTE:</u> Antes de la fecha de su audiencia, visite el sitio web de la Corte para saber cuáles son las instrucciones más actuales para participar en la audiencia y tener acceso a los servicios disponibles para responder a sus preguntas.
Casos Civiles - https://www.occourts.org/media-relations/civil.html
Casos de Probate y Salud Mental - https://www.occourts.org/media-relations/probate-mental-health.html
División de apelaciones - https://www.occourts.org/media-relations/appeals-records.html

<u>QUAN TRỌNG:</u> Trước ngày phiên tòa của quý vị, vui lòng kiểm tra trang mạng của tòa án để biết những hướng dẫn mới nhất về cách ra hầu phiên tòa của quý vị và tiếp cận những dịch vụ hiện có để giải đáp những thắc mắc của quý vị.
Vấn Đề Dân Sự - https://www.occourts.org/media-relations/civil.html
Thủ Tục Di Chúc/Sức Khỏe Tinh Thần - https://www.occourts.org/media-relations/probate-mental-health.html
Ban phúc thẩm - https://www.occourts.org/media-relations/appeals-records.html

Clerk of the Court,  By: _____ , Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**

North Justice Center
1275 N. Berkeley Ave
Fullerton  92838

**SHORT TITLE:** CREED UNCO, LLC VS. GUZMN Y GOMEZ (HOLDINGS) LIMITED

| **CLERK'S CERTIFICATE OF SERVICE BY MAIL** | CASE NUMBER:<br>**30-2023-01333752-CU-FR-NJC** |
| --- | --- |

I certify that I am not a party to this cause. I certify that a true copy of the above <u>Notice of Hearing</u> has been placed for collection and mailing so as to cause it to be mailed in a sealed envelope with postage fully prepaid pursuant to standard court practices and addressed as indicated below. The certification occurred at <u>Fullerton</u> , <u>California</u>, on <u>06/30/2023</u>. Following standard court practice the mailing will occur at <u>Sacramento, California</u> on <u>07/03/2023</u>.

Clerk of the Court, by: _____ , Deputy

LARSEN & NADDOUR, LLP
15615 ALTON PARKWAY # 450
IRVINE, CA 92618

BOHM WILDISH & MATSEN, LLP
600 ANTON BOULEVARD # 640
COSTA MESA, CA 92626

V3 1013a (June 2004)                                                    Code of Civil Procedure , § CCP1013(a)